# In the

# United States Court of Appeals

## For the Seventh Circuit

No. 01-1002

OCONOMOWOC RESIDENTIAL PROGRAMS,
INCORPORATED, a domestic corporation,

*Plaintiff-Appellee,*

and

WISCONSIN COALITION FOR ADVOCACY,
a domestic non-profit corporation,
JANET K., by her legal guardians,
GERALDINE K. and CLARENCE K.,
and VALERIE D., by her legal
guardian, THERESA H.,

*Intervenors-Appellees,*

*v.*

CITY OF MILWAUKEE,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 97 C 251—**J.P. Stadtmueller,** *Chief Judge.*

ARGUED SEPTEMBER 5, 2001—DECIDED AUGUST 8, 2002

Before CUDAHY, ROVNER, and DIANE P. WOOD, *Circuit Judges.*

ROVNER, *Circuit Judge*.   After the City of Milwaukee
(City) denied Oconomowoc Residential Programs, Inc. (ORP)
a zoning variance to operate a community living facility
in the City, ORP sued the City for violations of the Fair
Housing Amendments Act (FHAA) and the Americans
with Disabilities Act (ADA). The district court granted
Oconomowoc's and plaintiff-intervenors' motion for partial
summary judgment and denied the City's motion for sum-
mary judgment. The City appeals, and we affirm.

## I.

Summary judgment is appropriate where there is no
genuine issue of material fact and the moving party is
entitled to judgment as a matter of law. Fed. R. Civ. P.
56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23
(1986). We review the district court's ruling on summary
judgment *de novo*, construing the record in the light most
favorable to the non-movant. *O'Neal v. City of New Albany,*
No. 00-3091, 2002 WL 1305540, at *2 (7th Cir. June 14,
2002).

This controversy arose over plaintiff ORP's application
to operate a community living facility for six adults im-
paired by traumatic brain injury or developmental disabil-
ities or both. The City, through its Board of Zoning Appeals
(BOZA), denied the request for a variance pursuant to a
municipal ordinance restricting such homes from operating
within 2,500 feet (approximately one half of a mile) of
another community living arrangement.

ORP is a Wisconsin corporation licensed by the State to
operate community-based residential programs. The Wis-
consin Department of Health and Family Services (DHFS)
regulates its operations. Homes for Independent Living
(HIL), a division of ORP, operates approximately ninety-
five group homes which provide residential and support
services to persons with developmental disabilities, chronic

mental illness, and traumatic brain injuries. Over 800 persons in ten southeastern Wisconsin counties receive services provided by HIL.

Plaintiff-intervenor, Wisconsin Coalition for Advocacy, Inc. (WCA) is a non-profit Wisconsin corporation which provides statewide advocacy and protection for the rights of persons with disabilities. Wisconsin statutes grant WCA the responsibility and authority to pursue legal and other remedies for persons with developmental disabilities or mental illness. Wis. Stat. § 51.62(2)-(3). Plaintiff-intervenors Janet K. and Valerie D. are residents of Milwaukee County and each has suffered a traumatic brain injury.[1] Because Janet K.'s injuries occurred prior to adulthood, she also has been diagnosed as having a developmental disability. Both Janet K. and Valerie D. have been determined to be incompetent, thus their legal guardians, Geraldine and Clarence K., and Theresa H. respectively, brought this action on their behalf. Both Janet K. and Valerie D. are under protective placement orders pursuant to the State of Wisconsin's civil commitment statute for long-term placement. Wis. Stat., Chap. 55. Pursuant to a district court order defining Ms. K's least restrictive placement, Janet K. must be placed in a group home or community-based residential facility. Under a similar court order, Valerie D. must be placed in a group home, adult family care home, supervised apartment, or other comparable community placement.

Aware of the need for community-based residential facilities for people with traumatic brain injury and developmental disabilities, ORP staff worked for over a year with a local real estate agent to find a home that would be physically and financially appropriate for such a group

---

[1] The District Court granted WCA, Janet K. and Valerie D.'s petition to intervene on November 18, 1997.

home. On August 20, 1996, ORP applied for an occupancy permit for a community-based residential facility for six developmentally disabled or traumatically brain injured adults at 2850 North Menomonee River Parkway in Milwaukee. In September, 1996, ORP purchased the house for $280,000. During the application for an occupancy permit however, ORP ran into a stumbling block.

As part of its zoning code, Milwaukee restricts the placement of community living arrangements. Milwaukee permits community living arrangements for not more than eight persons in single residence districts, subject to certain special conditions. Milwaukee, Wi., Code of Ordinances § 295-112. Those conditions are as follows:

> **Special Conditions. 1. GROUP LIVING FACILITIES. a.** Small foster homes and community living arrangements shall not be located within 2,500 feet of each other and their cumulative capacities shall not exceed one percent of the population of an aldermanic district. Certificates of occupancy shall be issued only upon evidence that a facility has been licensed by either the state of Wisconsin, Milwaukee County or a child welfare agency.

*Id.* at § 295-14-1(a). A "community living arrangement" is defined as follows:

> **b.** Community-based residential facility. A facility where 3 or more adults not related to the operator reside and are provided with care, treatment or services above the level of room and board but less than nursing care. Such care must include supportive home care service unless contraindicated by the facility program, and may also include 7 hours or less of prescribed personal care service per week, per resident. The term does not include nursing homes, prisons, jails, community correctional residential centers, convents or facilities owned or operated exclusive-

ly by and for members of a religious order, or educational institutions and related student housing.

*Id.* at § 295-7-37(b).

Relying on the Milwaukee ordinance regarding the 2,500-foot requirement, the City of Milwaukee Department of Building Inspection (DBI)[2] refused to issue an occupancy permit to ORP. By letter dated November 4, 1996, DBI returned ORP's application stating that ORP could not operate a community-based residential facility at that site without violating § 25-14-1 of the Milwaukee ordinance, as there were already two other group homes operating within 2,500 feet of the proposed home, one of which was operating within 358 feet of the proposed home. In addition to its determination that the proposed home violated the spacing requirements, the DBI made several other observations in its letter. First, it noted that the proposed group home sits on the fringe of the flood plain of the Menomonee River. It then expressed concerns about the volume of traffic on the road during the summer months, and the fact that the road does not have sidewalks for pedestrian traffic. DBI informed ORP that it could seek a variance by appealing to BOZA. According to the Milwaukee municipal code, DBI has no authority to grant a permanent variance for the occupancy of any building if the intended use and plans do not conform with the City's ordinances. *Id.* at § 295-51-1(a).

By the time ORP received the letter from DBI, it had already applied to BOZA for a waiver of the 2,500-foot rule. In its application, filed on October 24, 1996, ORP submitted its plan of operation for a six-person home with non-live-in, round-the-clock staff. BOZA held a hearing on the variance request on January 16, 1997.

---

[2]  DBI is now called the Department of Neighborhood Services.

During the BOZA hearing, ORP's counsel argued that the variance was necessary as a reasonable accommodation under the FHAA. To support this claim, ORP presented evidence regarding the need in the City and County of Milwaukee for residential facilities for persons with traumatic brain injuries. Specifically, ORP presented evidence regarding the difficulties in locating resources and facilities to provide services to brain injured individuals in the least restrictive environment consistent with the needs of the disabled person as required by state statute. ORP presented detailed information about the needs of the individual plaintiffs Janet K. and Valerie D. At the time of the hearing, both plaintiffs were living in a nursing home, though each was the subject of a court order requiring them to be placed in a less restrictive environment, such as a community-based residential facility. Each of the plaintiffs' respective guardians desired that they be placed in the home at 2850 North Menomonee River Parkway. ORP and Milwaukee County had reviewed the placements of Janet K. and Valerie D and determined that they could be transferred to the proposed group home as soon as the facility could open.

ORP presented evidence that, due to limited state funding, community services for persons with disabilities are available to only a limited number of persons each year. Janet K. and Valerie D. were eligible for and received one of only a few specialized "brain injury waiver program" slots for 1996.

The prospective neighbors of the group home appeared at the hearing to lodge their concerns about the facility. Neighbors expressed concern that the brain injured patients might become violent and threaten the safety of residents of the community. One neighbor objecting to the proposed variance testified that his wife and the wife of another objecting neighbor were both psychologists and "could attest to the fact that brain injured patients

can and do become violent." Another objecting neighbor testified that between 1942 and 1950 he had a brain injured uncle who lived with the family, but who had to be removed to a mental institution when he become violent. Other neighbors raised concerns about the amount of traffic on the parkway, parking restrictions that could constitute a hazard for the group home residents, the lack of sidewalks, particularly in relation to the amount and speed of the traffic on the parkway, and the potential for flooding. Some were concerned that the inclined driveway of the home could present a danger to residents as they entered and exited handicap-accessible vans. Lee Jensen, the Commissioner of DBI, testified at the hearing in opposition to the variance, not in his official capacity, but as a prospective neighbor of the facility.

As part of the proceedings, the Office of the City Engineer issued a report to BOZA that concluded that the proposed community-based residential facility would not have a "significant adverse impact" on traffic and parking conditions in the neighborhood.

An attorney for a number of neighbors opposing the variance presented evidence of ORP's history as a group home operator. The evidence included reports of various investigations by DHFS regarding allegations of errors, negligence, or wrongdoings by staff of ORP corporate affiliates. The history included reports that (1) one resident received a double dose of medication; (2) DHHS had determined that a staff member sexually assaulted a resident; (3) eight residents were left outside of a home without supervision for forty-five minutes; (4) one facility failed to report in a timely manner that a staff member had physically abused a resident; (5) another facility neglected a five-year-old basement flooding problem, and had rotting and mold problems as a result; (6) staff of a facility for developmentally disabled adults failed to control noise coming from the residents; (7) police offi-

cers were called to respond to physical outbursts by residents of a facility for the developmentally disabled; (8) police officers were called on numerous occasions to another group home to respond to reports of combative assaults by a particular resident; and (9) an elderly resident of a group home was found in the Menomonee River.

Rather than making a decision immediately following the January 17, 1997 hearing, BOZA allowed the parties until February 6, 1997, to file written responses to the record. Counsel for ORP supplemented the record, responding to the allegations of ORP's failings as a group home operator.

On February 6, 1997, BOZA voted to deny the request for a variance. On March 10, 1997, BOZA issued its written decision denying the request. The decision stated that the variance request was a "flagrant violation of the state's distance requirement," noting that there is another facility located 358 feet away, two others within 2,500 feet, and two more just slightly outside of the 2,500-foot boundary. BOZA's decision also expressed concern for the safety of the residents due to the high traffic and lack of sidewalks on the Menomonee River Parkway. The decision stated that, based on the allegations of problems emanating from other ORP facilities, the proposed facility could impose undue costs, expenses, or other burdens on the City. The decision went on to note that the City had done its fair share of providing community living arrangements and group homes, in part by granting thirty-nine variances to the spacing ordinance, and that the rest of Milwaukee County had many sites available.[3]

---

[3] ORP provided BOZA with evidence that group homes do not adversely affect property values. In addition, it demonstrated
(continued...)

Due to the delay caused by the hearing, Milwaukee County staff obtained permission to allow Janet K. and Valerie D. to use their brain injury waiver slots in 1997 rather than in 1996. After learning of BOZA's denial, Milwaukee County staff asked ORP to provide alternative services to plaintiffs Janet K. and Valerie D. ORP proposed to operate the 2850 North Menomonee River Parkway home as a two-person adult family home to serve them on an interim basis pending the appeal of BOZA's decision.

Because slight modifications to the building were needed to accommodate the two women, ORP hired a contractor and applied for a building permit. Commissioner Jensen, however, had a note placed in ORP's file that no permit could be issued for any work at 2850 North Menomonee River Parkway without his approval or that of another deputy commissioner. The City took the position that any use of the premises by ORP would constitute an "illegal business," even if only two persons lived at the home.

Due to the impending expiration of Janet K.'s and Valerie D.'s brain injury waivers, the plaintiffs filed a motion for a preliminary injunction on November 7, 1997. On November 26, 1997, by agreement of the parties, Janet K. and Valerie D. moved into the premises on an interim basis pending the resolution of this case.[4] The plaintiffs filed their motion for partial summary judgment on March 13, 1998, and the defendant filed a cross motion for summary judgment on April 14, 1998.

---

[3] (...continued)
that, because of the 2,500-foot rule, no one could open a group home anywhere in the City of Milwaukee other than in two aldermanic Districts or in nine prohibitively expensive suburbs in Milwaukee County.

[4] The group home is now operating at full capacity with six residents.

The case was assigned to a magistrate who filed a recommendation with the court on January 27, 1999. In that recommendation, the magistrate (1) rejected the City's argument that the current ordinance provides a reasonable accommodation for disabled persons who wish to live in community living arrangements; (2) found that the plaintiffs met their burden of showing that the requested accommodation did not impose undue financial or administrative burdens on the City or require a fundamental alteration in the nature of the program and therefore was a reasonable accommodation; (3) found that the plaintiffs met their burden of showing that the accommodation requested by the City was necessary to allow the plaintiffs to have an equal opportunity to live in a single family neighborhood in the City of Milwaukee; (4) found that the City failed to submit sufficient evidence to establish that the variance would impose an undue financial or administrative burden; and (5) found that the City failed to reasonably accommodate the plaintiffs.

On March 16, 1999, the district court issued its order addressing the City's objections and adopting the magistrate's recommendation in full. After a trial on damages, on November 30, 2000, the district court awarded compensatory damages to ORP in the amount of $207,841 and to Janet K. and Valerie D. each in the amount of $12,500. The district court did not, however, enjoin the City from enforcing the spacing ordinance.

## II.

### A. Reasonable Accommodation

The plaintiffs maintain that the City's refusal to grant them an exception to the 2,500-foot rule violates both the FHAA and the ADA. The Fair Housing Act (FHA) was enacted "to provide, within constitutional limita-

tions, for fair housing throughout the United States." 42 U.S.C. § 3601. The amendments to the Fair Housing Act, contained in the FHAA, specifically prohibit discrimination in housing on the basis of disability. 42 U.S.C. § 3604(f). The FHAA makes it illegal

> (1) To discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of—(A) that buyer or renter, . . . (2) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of—(A) that person.

42 U.S.C. § 3604(f)(1)-(2). It is worded as "a broad mandate to eliminate discrimination against and equalize housing opportunities for disabled individuals." *Bronk v. Ineichen*, 54 F.3d 425, 428 (7th Cir. 1995). Unlawful discrimination includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). The FHAA defines handicap as "(1) a physical or mental impairment which substantially limits one or more of such person's major life activities, (2) a record of having such an impairment, or (3) being regarded as having such an impairment." 42 U.S.C. 3602(h).

Congress explicitly intended for the FHAA to apply to zoning ordinances and other laws that would restrict the placement of group homes. H. R. Rep. No. 100-711, at 24 (1988), *reprinted in* 1988 U.S.C.C.A.N. 2173, 2185 (stating that the amendments "would also apply to state or local land use and health and safety laws, regulations, practices or decisions which discriminate against individuals with handicaps"); *see also Hemisphere Bldg. Co. v. Village of Richton Park*, 171 F.3d 437, 438 (7th Cir. 1999)

("the cases hold or assume . . . that the [FHAA] applies to municipalities, and specifically to their zoning decisions"); *Larkin v. Michigan Dep't of Soc. Servs.*, 89 F.3d 285, 289 (6th Cir. 1996) (noting that Congress intended for the FHAA to apply to zoning ordinances that restrict the placement of group homes).

Like the FHAA, the ADA "provide[s] a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). Under the proscriptions of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Although the ADA does not explicitly define "services, programs, or activities," the regulations promulgated pursuant to the act state that "title II applies to anything a public entity does." 28 C.F.R. pt. 35, app. A. The courts to have considered the issue have held that the ADA clearly encompasses zoning decisions by local government entities. *Regional Econ. Comty. Action Program, Inc. v. City of Middletown*, Nos. 00-6318, 00-6354, 2002 WL 449493, at * 4 (2d Cir. N.Y. Feb. 19, 2002) *petition for cert. filed*, No. 01-1624 (May 3, 2002); *Bay Area Addiction Research and Treatment, Inc. v. City of Antioch*, 179 F.3d 725, 730 (9th Cir. 1999).

The definition of a disability under the ADA is substantively identical to that in the FHAA. 42 U.S.C. § 12102(2). Furthermore, as with the FHAA, under the ADA, a public entity must reasonably accommodate a qualified individual with a disability by making changes in rules, policies, practices, or services when needed. *Dadian v. Village of Wilmette*, 269 F.3d 831, 838 (7th Cir. 2001); *see also* 28 C.F.R. § 35.130(b)(7) (stating in regulations interpreting Title II of the ADA, "[a] public entity shall make

reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program or activity"). The "'reasonable accommodation' provision prohibits the enforcement of zoning ordinances and local housing policies in a manner that denies people with disabilities access to housing on par with that of those who are not disabled." *Hovsons, Inc. v. Township of Brick*, 89 F.3d 1096, 1104 (3d Cir. 1996) (internal citation omitted).

The FHAA requires accommodation if such accommodation (1) is reasonable, and (2) necessary, (3) to afford a handicapped person the equal opportunity to use and enjoy a dwelling. 42 U.S.C. § 3604(f)(3)(B); *see also Howard v. City of Beavercreek*, 276 F.3d 802, 806 (6th Cir. 2002); *Lapid-Laurel, L.L.C. v. Zoning Bd. of Adjustment*, 284 F.3d 442, 457 (3d Cir. 2002); *Bryant Woods Inn, Inc. v. Howard County, Maryland*, 124 F.3d 597, 603 (4th Cir. 1997); *Smith & Lee Assoc. v. City of Taylor, Michigan*, 102 F.3d 781, 794 (6th Cir. 1996). The requirements for reasonable accommodation under the ADA are the same as those under the FHAA. 42 U.S.C. 12131(2); *see also Dadian*, 269 F.3d at 838 (analyzing the requirement to reasonably accommodate under the ADA and FHAA as one); *and compare Erdman v. City of Fort Atkinson*, 84 F.3d 960, 962 (7th Cir. 1996) (stating that the term "reasonable accommodation" in the FHAA is often interpreted by analogy with the same phrase in the Rehabilitation Act), *with Gile v. United Airlines, Inc.*, 95 F.3d 492, 497 (7th Cir. 1996) (noting that the definition of "reasonable accommodation" in the Rehabilitation Act is the same as that in the ADA).

The burden is on the plaintiffs to show that the accommodation it seeks is reasonable on its face. *USAirways,*

*Inc. v. Barnett*, ___ U.S. ___, ___, 122 S. Ct. 1516, 1523 (2002). Once the plaintiffs have made this prima facie showing, the defendant must come forward to demonstrate unreasonableness or undue hardship in the particular circumstances. *Id.*; *see also Vande Zande v. Wisconsin Dep't of Admin.*, 44 F. 3d 538, 543 (7th Cir. 1995).[5]

The City argues that the plaintiffs bear the burden of proof with respect to the issue of reasonable accommodation, citing both the Fifth and Fourth circuits in *Bryant Woods Inn, Inc.*, 124 F.3d at 603-604 and *Elderhaven, Inc. v. City of Lubbock, Texas*, 98 F.3d 175, 178 (5th Cir. 1996). The City, however, offers no reason for choosing this regime over the method used by the Second, Third, Eighth, Ninth, and Tenth Circuits which require a plaintiff to make an initial showing that an accommodation is reasonable, but then places the burden on the defendant to show that the accommodation is unreasonable. *See e.g.*, *Lapid-Laurel, L.L.C.*, 284 F.3d at 457; *Vinson v. Thomas*, 288 F.3d 1145, 1154 (9th Cir. 2002), *petition for cert. filed*, No. 01-1878 (June 20, 2002); *Jackan v. New York State Dep't of Labor*, 205 F.3d 562, 566 (2d Cir. 2000), *cert. denied*, 531 U.S. 931 (2000); *Fjellestad v. Pizza Hut of America, Inc.*, 188 F.3d 944, 950 (8th Cir. 1999); *White v. York Int'l Corp.*, 45 F.3d 357, 361 (10th Cir. 1995). And though this Court has never explicitly labeled the test it employs, in *Vande Zande*, 44 F.3d at 543, we describe a

---

[5] This burden-shifting analysis applies to the "necessary" and "equal opportunity" elements of the requirement as well, as "a plaintiff is in the best position to show what is necessary to afford its clients (i.e., the handicapped population that it wishes to serve) an equal opportunity to use and enjoy housing, [while] a defendant municipality is in the best position to provide evidence concerning what is reasonable or unreasonable within the context of the zoning scheme." *See Lapid-Laurel, L.L.C.*, 284 F.3d at 458-59.

process similar to that used by the Second, Third, Eighth, Ninth, and Tenth Circuits in evaluating the reasonableness of a requested accommodation under the FHAA:

> The employee must show that the accommodation is reasonable in the sense both of efficacious and of proportional to costs. Even if this prima facie showing is made, the employer has an opportunity to prove that upon more careful consideration the costs are excessive in relation either to the benefits of the accommodation or to the employer's financial survival or health.

*Id. See also*, *USAirways, Inc.*, ___ U.S. ___, 122 S. Ct. at 1523 (acknowledging the burden-shifting regime used by appellate courts).

We begin by focusing on the definitions of the three key elements of a reasonable accommodation: "reasonable," "necessary," and "equal opportunity." Whether a requested accommodation is reasonable or not is a highly fact-specific inquiry and requires balancing the needs of the parties. *Dadian*, 269 F.3d at 838. An accommodation is reasonable if it is both efficacious and proportional to the costs to implement it. *Vande Zande*, 44 F.3d at 543. An accommodation is unreasonable if it imposes undue financial or administrative burdens or requires a fundamental alteration in the nature of the program. *Erdman*, 84 F.3d at 962 (internal citations omitted). In assessing costs, the court may look at both financial and administrative costs and burdens. *Bryant Woods Inn, Inc.*, 124 F.3d at 604. A zoning waiver is unreasonable if it is so "at odds with the purposes behind the rule that it would be a fundamental and unreasonable change." *Dadian*, 269 F.3d at 838-39.

"Whether the requested accommodation is necessary requires a 'showing that the desired accommodation will affirmatively enhance a disabled plaintiff's quality of life

by ameliorating the effects of the disability.'" *Dadian*, 269 F.3d at 838 (citing *Bronk*, 54 F.3d at 429). In other words, the plaintiffs must show that without the required accommodation they will be denied the equal opportunity to live in a residential neighborhood.

In this context, "equal opportunity" means the opportunity to choose to live in a residential neighborhood. *Lapid-Laurel, L.L.C.*, 284 F.3d at 460; *Smith & Lee Assoc.*, 102 F.3d at 794. The FHAA "prohibits local governments from applying land use regulations in a manner that will . . . give disabled people less opportunity to live in certain neighborhoods than people without disabilities." *Smith & Lee Assoc.*, 102 F.3d at 795 (internal citation omitted). Often, a community-based residential facility provides the only means by which disabled persons can live in a residential neighborhood, either because they need more supportive services, for financial reasons, or both. *Erdman,* 84 F.3d at 963; *Brandt v. Village of Chebanse, Illinois*, 82 F.3d 172, 174 (7th Cir. 1996); *Larkin*, 89 F.3d at 291; *Hovsons, Inc.*, 89 F.3d at 1105; *Smith & Lee Assoc.*, 102 F.3d at 795-96. When a zoning authority refuses to reasonably accommodate these small group living facilities, it denies disabled persons an equal opportunity to live in the community of their choice. *Erdman*, 84 F.3d at 963.

Turning to the facts in this case, the City argues that it reasonably accommodates group homes in two ways. First, it permits group homes in single family districts without qualification if they are not within 2,500 feet of one another. For those that are less than 2,500 feet from another group home, the ordinance allows the facility to apply for a waiver through BOZA's hearing process. Yet under no circumstances is BOZA required (or even encouraged) to grant a variance in favor of a group home. And the right to appeal to BOZA for a variance is not in and of itself an accommodation. As the district

court pointed out, "merely because a group home will have the right to open in limited cases is not an accommodation, however, it is merely good fortune. It is just as likely, as in the present case, that the proposed home will fall within 2,500 feet of another group home rule and permit the municipality to veto the opening of the home in the first instance." *Oconomowoc Residential Programs, Inc. v. City of Milwaukee*, No. 97-C-251, slip op. at 13 (E.D. Wis. Mar. 16, 1999).

Since the City's current system does not provide a reasonable accommodation, we look to see whether the accommodation requested by the plaintiffs (1) is reasonable, and (2) necessary, (3) to allow them an equal opportunity to use and enjoy housing in the City.

The plaintiffs assert that the variance they request is a reasonable accommodation that would pose significant benefits to developmentally disabled and brain injured persons by allowing them to live together in a family setting in a residential community without imposing undue financial or administrative burdens on the City. The City counters that the variance requested by the plaintiffs would be unreasonable. As support for its proposition, the City focuses on ORP's history of problems operating other group homes, dangers emanating from the high volume of traffic along the Menomonee River Parkway during certain times of the day and year, the lack of sidewalks along the road, and the potential for the Menomonee River to flood. The City asserts that this evidence demonstrates that the home would impose undue financial and administrative burdens upon the City. Yet the City has failed to put forth evidence regarding the nature or quantity of these burdens.

For example, though the City describes many DHFS-written reports about ORP, describing individual instances of client over-medication, sexual abuse, neglect, physical

abuse, client outbursts and fighting, police calls, and the drowning death of an elderly resident, it fails to link this laundry list of problems in other facilities with any financial or administrative burdens it might bear with this particular facility. Although any claim of abuse or neglect of disabled or elderly group residents is troubling, the state licensing authority has the burden of assuring the safety and security of group home residents through its licensing authority.[6] The state has never refused, revoked, or suspended an ORP license to operate. The City argues that ORP's past errors "*tend* to establish a burden" and that "it *stands to reason* that the City of Milwaukee will have the *likelihood* of an increased burden with a group home operated by this particular provider." Reply brief at 7 (emphasis supplied). But this type of speculation fails to support the City's claim of unreasonableness.

The City did not put forth evidence that police calls from the group home will pose an undue burden. In its description of prior problems ORP has had at other homes, the City notes that the police were called to two other group homes on several occasions to respond to physical outbursts or combative behavior by residents.[7] Again, the City did not demonstrate that the group home at issue in this case is any more likely to generate calls to the police than other area residents. There is simply no evi-

---

[6] This same list of complaints about other ORP facilities was presented to the court by the defendant in *Oconomowoc Residential Programs, Inc. v. City of Greenfield*, 23 F. Supp. 2d 941, 958 (E.D. Wis. 1998). Like the district court in the instant case, the district court in that case dismissed this evidence as pertaining to matters related to licensing rather than zoning.

[7] ORP claims that the City did not distinguish between homes for those with chronic mental illness, which generate more police calls, and homes for the developmentally disabled or traumatically brain injured.

dence anywhere in the record that group facilities impose on the City additional costs for emergency services. We are left to speculate that the police receive more complaints about group homes than they do about other neighborhood residences, that they respond to more requests from group homes, and that they would receive more calls from this particular group home.

As for the other alleged dangers, the majority of the evidence regarding the dangers imposed by the group home's geographic proximity to the river and the Menomonee River Parkway came from anecdotal testimony of various neighbors of the proposed facility, who also expressed concern about the potential for brain injured individuals to become violent and to threaten the safety of the neighborhood. The City cannot, however, rely on the anecdotal evidence of neighbors opposing the group home as evidence of unreasonableness. A denial of a variance due to public safety concerns or concerns for the safety of the residents themselves cannot be based on blanket stereotypes about disabled persons rather than particularized concerns about individual residents. *Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1503-04 (10th Cir. 1995). The FHAA "repudiates the use of stereotypes and ignorance, and mandates that persons with handicaps be considered as individuals. Generalized perceptions about disabilities and unfounded speculations about threats to safety are specifically rejected as grounds to justify exclusion." *Id*. (quoting H.R. Rep. No. 100-711 at 18 (1988), 1988 U.S.C.C.A.N. 2173, 2179). The City has not presented any valid evidence that the residents who this group home seeks to serve will present a threat either to their own safety or the safety of others. On the other side of the traffic coin, the City's own engineer testified that the proposed group home would not have a significant adverse impact on traffic and therefore will not, in this fashion, impose any financial or administrative burdens on the City.

Similarly, the City made much of the potential for flooding near the group home, but again failed to provide any evidence that the group home would pose any higher burden on the City's emergency services than would any other residences in the flood-prone area. The one instance of flooding that the City cites in its brief took place four months after the BOZA hearing and after BOZA had already voted to deny the variance. The City's sole support of undue burden emanating from the flood zone comes from the affidavit of a firefighter who, while the Menomonee River had flooded, responded to a mistaken claim that gas was leaking in a group home for the elderly. The mere fact that residents of the proposed group home "will at times require the assistance of the local police and other emergency services does not rise to the level of imposing a cognizable administrative and financial burden upon the community." *Hovsons, Inc.*, 89 F.3d at 1105.

For the same reasons, the City's argument about the burden imposed by the clustering of group homes fails. The City asserts that over-concentration of group homes will result in disproportionate costs to emergency services for those facilities. Yet again, the City fails to explain how two group homes located close together will place a greater demand on emergency services than those same two homes placed 2,500 feet apart.

The plaintiffs, on the other hand, have met their burden of demonstrating that the variance was necessary to provide them with an equal opportunity to use and enjoy a dwelling. Janet K. and Valerie D.'s range of residential living choices is restricted by their disabilities. Both require a living arrangement where supportive services are available twenty-four hours a day. Janet K.'s home must be wheelchair accessible. Neither woman could afford to purchase a home on her own. The other disabled persons that ORP serves similarly are unable to live in residen-

tial communities without the resources of a group home facility.

The City argues that the plaintiffs needed to present evidence of the City's treatment of non-disabled renters, students, rooming home residents, or other individuals who are similarly situated in order to demonstrate that they were denied an equal opportunity to live in a residential neighborhood. The City, however, ignores the fact that group living arrangements can be essential for disabled persons who cannot live without the services such arrangements provide, and not similarly essential for the non-disabled.

Because the spacing ordinance draws a nearly half mile circle around each existing group home, it currently precludes new group homes from opening in most of the City of Milwaukee, thus preventing disabled adults who cannot live without some support from residing in almost all residential neighborhoods within the City. ORP presented evidence to BOZA regarding the shortage of facilities in the City for persons with traumatic brain injury. Furthermore, despite the fact that courts had ordered both Janet K. and Valerie D. into less restrictive community living arrangements, both remained in large institutions for some time until the ORP opened the home at 2850 North Menomonee River Parkway for them. A variance was absolutely essential for the plaintiffs to have the equal opportunity to live in a residential community.

The plaintiffs sufficiently established that the accommodation was reasonable and necessary to provide them with an equal opportunity to enjoy housing in a residential community in Milwaukee. The burden then shifted to the City to prove either that the accommodation was

unreasonable or that it created an undue hardship.[8] At this point, these two options merge, since in this case showing a lack of reasonableness or undue hardship amount to the same thing. *See Walton v. Mental Health Ass'n*, 168 F.3d 661, 670 (3d Cir. 1999). The City failed to carry its burden on either front.

**B. Preemption**

The City urges this Court to determine that the FHAA and ADA do not preempt the City's spacing ordinance. Such a finding, however, is unnecessary. Because we have determined that the City failed to provide a reasonable accommodation, we decline to decide whether the FHAA or the ADA preempts the spacing ordinance.

**III.**

For the reasons stated above, we affirm the district court's grant of partial summary judgment in favor of the plaintiffs ORP, WCA, Janet K. and Valerie D., and its denial of summary judgment for the defendant, City of Milwaukee.

AFFIRMED.

---

[8] As the Supreme Court reiterated this term, the burden of demonstrating undue hardship always remains with the defendant. *USAirways, Inc.*, ___ U.S. at ___, 122 S. Ct. at 1522-23.

A true Copy:

      Teste:

 

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*