In the

# United States Court of Appeals
### For the Seventh Circuit

No. 02-3536

GOOD SHEPHERD MANOR FOUNDATION, INC., an Illinois not-for-profit corporation, GOOD SHEPHERD MANOR GROUP HOMES, INC., an Illinois not-for-profit corporation, GOOD SHEPHERD MANOR, INC., an Illinois not-for-profit corporation,

*Plaintiffs-Appellants,*

*v.*

CITY OF MOMENCE, a municipal corporation, WILLIAM PETERSON, JAMES SAINDON, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 01 CV 2105—**Michael P. McCuskey**, *Judge.*

ARGUED FEBRUARY 26, 2003—DECIDED MARCH 24, 2003

Before FLAUM, *Chief Judge*, and EASTERBROOK and KANNE, *Circuit Judges.*

FLAUM, *Chief Judge.* The City of Momence ("the city") shut off the water supply to a property lot, claiming that the owners had refused to fulfill an agreement to extend the property's water and sewage lines to the northern border of the property. Good Shepherd Manor Foundation, Inc., Good Shepherd Manor Group Homes, Inc., and

Good Shepherd Manor, Inc. (collectively "Good Shepherd"), who own the property and use it to provide housing for developmentally disabled adults,[1] brought suit against the city, its mayor, and its aldermen alleging various federal claims. The district court allowed most of the claims to proceed to jury trial, but it limited the theories under which Good Shepherd could press two of their claims. The jury found in favor of the city. Good Shepherd now appeals, arguing that the district court erred in three ways: 1) limiting the theories of liability that Good Shepherd could present to the jury; 2) refusing certain jury instructions that Good Shepherd had submitted; and 3) excluding the testimony of Good Shepherd's expert witness. For the reasons stated herein, we affirm.

## I. Background

Good Shepherd provides housing and related services for developmentally disabled adults. Pursuant to a State of Illinois mandate, Good Shepherd has moved the disabled adults that it cares for from a shelter care facility to a group home environment. Group home environments are highly beneficial for certain developmentally disabled adults.

Prior to 1998 Good Shepherd constructed six group homes. It obtained a grant to extend the city's water and sewer lines to these homes and the city provided water and sewage services. In 1998 Good Shepherd purchased an additional lot for two new homes. They applied to the city for water and sewage permits. The city requested that

---

[1] Good Shepherd Manor Foundation owns the property. Good Shepherd Manor Group Homes leases the land and operates the group homes on the property. Good Shepherd Manor provides professional services to the residents of the homes.

Good Shepherd extend the water lines on their property to the northern boundary to provide service to a lot that was owned by a Jehovah's Witness Congregation. According to Good Shepherd the lines were to be extended only on the condition that the Congregation would pay for the expense of extending the lines. Good Shepherd and the Congregation were unable to reach an agreement about paying the costs, and the lines were never extended to the northern border of Good Shepherd's property. Good Shepherd built the new homes, and the city turned on the water in March 2001. On April 26, 2001, after learning that the lines had not been extended and just prior to the grand opening of the homes, the city turned off the water to these two homes. The city claims that it shut off the water because Good Shepherd would not extend the lines to the northern border as agreed upon. Because there was no water service, Good Shepherd was unable to secure occupancy permits for the homes.

Good Shepherd brought suit alleging violations of the Fair Housing Amendments Act (FHAA), the Americans with Disabilities Act (ADA), the Rehabilitation Act, and the Constitution. Good Shepherd sought injunctions as well as declaratory relief and damages. The court granted an emergency Motion for Mandatory Preliminary Injunction. Pursuant to this injunction, on May 11, 2001, the city turned on the water. The city filed lawsuits in state court attempting to prevent the county from issuing permanent occupancy permits. These attempts failed.

In the federal district court both parties moved for summary judgment. These motions were denied. The district court did however limit the theories under which Good Shepherd could pursue its FHAA and ADA claims. Good Shepherd was seeking liability for discrimination under the theory of discriminatory intent and impact and under a theory that the city failed to provide reasonable accommodations. The district court ruled

that the reasonable accommodation analysis was not applicable to the facts of the case and thus precluded Good Shepherd from presenting that theory at trial.

A jury trial followed. The jury found in favor of the city. Good Shepherd appeals.

## II. Discussion

Good Shepherd's primary challenge on appeal is to the district court's ruling that it could not present a theory of failure to reasonably accommodate. Additionally Good Shepherd challenges the district court's decision to exclude Good Shepherd's expert witness, and the district court's rejection of two of Good Shepherd's proposed jury instructions. We start our analysis with their primary challenge.

### A. Reasonable Accommodation

As a preliminary matter the requirements for showing failure to reasonably accommodate are the same under the ADA and the FHAA so we can treat these issues as one. *Oconomowoc Residential Programs, Inc. v. City of Milwaukee*, 300 F.3d 775, 783 (7th Cir. 2002). These statutes require a public entity to reasonably accommodate a disabled person by making changes in rules, polices, practices or services as is necessary to provide that person with access to housing that is equal to that of those who are not disabled. *Id.*

Good Shepherd claims that the city failed to provide a reasonable accommodation when it refused to reconsider its *ad hoc* decision to shut off the water supply to the lot in question. The district court rejected this argument, basing its holding on *Hemisphere Building Co. v. Village of Richton Park*, 171 F.3d 437 (7th Cir. 1999). In that case

this court explained that we confine "the duty of reasonable accommodation in 'rules, polices, practices, or services' to rules, policies, etc. that hurt handicapped people *by reason of their handicap*, rather than that hurt them solely by virtue of what they have in common with other people, such as a limited amount of money to spend on housing." *Id.* at 440. Focusing on this language, the district court noted:

> In this case, the service of water is something that is needed by all people. Therefore, the City's failure to provide the "reasonable accommodation" of providing water to Plaintiff's group homes did not hurt Plaintiff's residents by reason of their handicap but, instead, hurt them solely by virtue of what they have in common with other people, the need of water.

This conclusion is correct, and is an appropriate application of the legal principle announced in *Hemisphere,* and therefore we do affirm.

It is worth noting the city in asking us to affirm inexplicably advances a separate—and unsound—argument, revealing a misunderstanding of that ruling and of the law of this circuit. The city suggests that when this court in *Hemisphere* said "by reason of their handicap" it was referring to the motivation behind the failure to accommodate. Thus, the city summarizes their argument as, "This is not a 'reasonable accommodation' case since there is no evidence that the city's actions were taken because of the proposed residents' handicaps." This is an irrelevant argument. The *Hemisphere* language was referring to the harmful effect that the failure to accommodate has on the handicapped. For example if a city required all houses to have narrow doorways, and the city failed to waive this requirement, this might harm people in wheelchairs by reason of the fact that they are in wheelchairs. In such a case the city would be required

to waive this rule for wheelchair-bound residents wherever such waiver was reasonable. This requirement to reasonably accommodate would exist regardless of the motivation behind the narrow-doorway rule. If the city unreasonably refused to waive the rule, the plaintiffs would be under no obligation to prove that the rule was motivated by an animus toward handicapped people. The error in the city's logic is all the more clear when we consider that reasonable accommodation is a theory of liability separate from intentional discrimination. If the motivation of the city in cutting off the water to Good Shepherd was based on their handicap, then Good Shepherd would have been entitled to judgment under the theory of intentional discrimination—this is precisely the question that was tried to the jury at the district court. "Failure to reasonably accommodate" is an alternative theory of liability. The theory would be entirely redundant if it required proof that the defendants' actions were motivated by animus towards the handicapped. Indeed for the reasonable accommodation theory to be meaningful, it must be a theory of liability for cases where we assume there is a valid reason behind the actions of the city, but the city is liable nonetheless if it failed to reasonably accommodate the handicap of the plaintiff.

Good Shepherd argues that the failure to accommodate in this case did harm the developmentally disabled adults "by reason of their handicap." Good Shepherd explains that developmentally disabled adults gain a specific benefit from group living. This point is uncontested and well established in our case law. *See Brandt v. Village of Chebanse*, 82 F.3d 172, 174 (7th Cir. 1996) (noting that for many disabled residents "joint living arrangements are essential"); *Oconomowoc*, 300 F.3d at 787 ("[G]roup living arrangements can be essential for disabled persons . . . and not similarly essential for the nondisabled."). Good Shepherd then explains that by not supplying their lot with

water and sewage, the city harmed the disabled adults by preventing them from living in the group homes. Thus, Good Shepherd contends, the harm was "by reason of their disability" because the potential residents were denied the benefit they, as developmentally disabled adults, receive from group living.

This reasoning is too attenuated. The city did not deny developmentally disabled adults the opportunity for group living. The city denied water to a certain lot, and because that lot has no water it cannot be inhabited by Good Shepherd's residents, or by anyone else for that matter. These developmentally disabled adults are no differently affected by the lack of water than any other resident would have been. A residence with no water supply is unlivable. Any resident, handicapped or not, would have to find another place to live. The whole purpose behind the FHAA and ADA reasonable accommodation provisions is to "'prohibit[ ] local governments from applying land use regulations in a manner that will . . . give disabled people less opportunity to live in certain neighborhoods than people without disabilities.'" *Oconomowoc*, 300 F.3d at 784 (quoting *Smith & Lee Association v. City of Taylor,* 102 F.3d 781, 795 (6th Cir. 1996)) (second alteration in original). Cutting off water prevents anyone from living in a dwelling, not just handicapped people, and therefore the prohibitions found in the FHAA and the ADA do not apply to this case.

Good Shepherd wants us to adopt a principle that because a rule, policy, etc. that adversely affects all residents' ability to access a dwelling also affects disabled residents' access, a city must therefore provide a reasonable accommodation to such a rule, policy, etc. under the FHAA and the ADA. Good Shepherd's logic would create an exemption for the disabled from almost any zoning rule that creates a general inconvenience or expense. This circuit has made clear that such an outcome is not

intended by the statutes: "[I]t would be absurd to think that the FHAA overrides all local regulation of home construction." *Hemisphere*, 171 F.3d at 440. For that reason, as we explained in *Hemisphere*, courts do not take into account financial hardships that zoning rules may create generally, even if disabled people are more likely to be poor. *Id*. Doing so could lead to all sorts of unintended results, for example handicapped people "in the name of reasonable accommodation, could claim a real estate tax rebate under the Fair Housing Amendments Act." *Id*. at 441. As we explained in *Hemisphere*, "To support so radical a result, something more than a spinning out of the logical implications of 'reasonable accommodation' is necessary." *Id*. The rule Good Shepherd asserts is no different from the logic we rejected in *Hemisphere*.

Good Shepherd's case is even weaker because it appears that the city would have turned on the water if Good Shepherd had extended the water and sewage lines to the northern border. As such, Good Shepherd is really arguing that the city should have waived the line extension requirement in accommodation to the developmentally disabled adults who wished to live in the house. But this approach also fails to establish a viable theory of liability. Such a scenario is analogous to cases where cities require all residents to install sprinklers. In *Hemisphere* we explained that such a requirement does not raise an issue of reasonable accommodation: "We thus disapprove the district court cases in this circuit which have held that a city must, if requested by a handicapped person, waive its requirements for the installation of sprinklers because the requirements make the homes more expensive for the handicapped—as for everyone." *Hemisphere*, 171 F.3d at 441. In those cases the cities essentially said that people could not live on the lots unless they installed sprinklers. In the case before us

the city said essentially the same thing—no one can live[2] on the lot in question unless the resident extends the water and sewage lines to the northern border of the property.[3]

The only way Good Shepherd could prevail would be to show that the city shut off their water and refused to turn it back on even if Good Shepherd extended the pipes, and that there were virtually no other lots upon which group housing could be built. Under such facts they might have a claim, not for the city's actions in shutting off their water, but for the city's failure to provide any property upon which a group home could be built. *See*, *e.g.*, *Oconomowoc,* 300 F.3d at 787 (where city refused to waive an ordinance that prohibited a group home from being built within 2500 feet of another group home, the court held that the city failed to provide reasonable accommodation because this rule "precludes new group homes from opening in most of the City of Milwaukee, thus preventing disabled adults who cannot live without some support from residing in almost all residential neighborhoods within the City"). But that is

---

[2] Turning off the water supply to a residence has the same practical effect as a rule that prohibits the residence from being inhabited.

[3] This is not to say that the city did or did not have a right to make this demand. But that is irrelevant to our analysis. As the district court noted, the question of whether Good Shepherd was actually required to extend the pipes to the northern border was not being decided during the trial. As long as a demand affects all people equally, then there is no FHAA or ADA issue regardless of whether that demand was valid under state law. The question of whether the city could have validly required Good Shepherd to extend the lines is a question for state court. We are only concerned here with claims that fall under the FHAA and the ADA.

not the case before us. Good Shepherd has made no such allegations and rests its case solely on the faulty premise that the lack of water in this case somehow affects the developmentally disabled differently from the rest of the population.

In the end Good Shepherd has presented nothing to suggest that the alleged rules or actions of the city affected the developmentally disabled any differently than they affected all other people. For this reason the district court appropriately prevented them from proceeding under the reasonable accommodation theory.

### B.  The Expert Witness

The district court ruled that Susan Connor, Good Shepherd's expert witness who is a law professor and who works in urban planning, could not testify. We review the district court's decision to exclude expert testimony for an abuse of discretion. *United States v. Crotteau*, 218 F.3d 826, 831 (7th Cir. 2000). The proffered testimony was largely on purely legal matters and made up solely of legal conclusions, such as conclusions that the city's actions violated the FHAA. The district court correctly ruled that expert testimony as to legal conclusions that will determine the outcome of the case is inadmissible. *United States v. Sinclair*, 74 F.3d 753, 757 n.1 (7th Cir. 1996). Furthermore, Good Shepherd argued that it wanted to present the testimony to show that the city had no legal basis for shutting off the water because Good Shepherd was not required to extend the lines to the northern boundary. The district court ruled that this testimony, on top of consisting of legal conclusions, would have been irrelevant since the issue was not being tried. This ruling was plainly not an abuse of discretion.

Good Shepherd tries to pursue an alternative argument. The court, over Good Shepherd's objections, allowed

the city to claim at trial that the reason it shut off the water was because Good Shepherd failed to extend the lines to the northern border. This claim was introduced to rebut the allegation that they shut off the water with a discriminatory purpose. Good Shepherd claims that this was error because the city was allowed to argue that Good Shepherd had a duty to extend the lines, while Good Shepherd was prevented from providing an expert to testify that they had no such duty. Good Shepherd misunderstands the court's ruling on this point. The court did not allow the city to argue that Good Shepherd was actually required to extend the lines; instead the city was only allowed—and the court made this limitation clear—to argue that the dispute over the extension was the motivating factor in shutting off the water. The district court stated: "[The city] will not be allowed to turn this case into a trial on whether Plaintiffs [Good Shepherd] have any obligation to provide the water and sewer lines which are not at issue." Given this limitation, the district court was correct to rule that it was still irrelevant whether the city was correct in claiming that Good Shepherd had a duty to extend the lines; the only relevant question was whether the dispute motivated the city to shut the water off. In fact it is even irrelevant to ask if the city thought they were in the right on the dispute; they could have been trying to squeeze Good Shepherd. It does not matter as long as the motivation was not discriminatory against disabled people, and the district court limited the evidence to that point.

### C. Jury Instructions

Good Shepherd raises two challenges to the instructions the district court gave the jury. Their first claim is that the district court should have instructed the jury on reasonable accommodation. Because the district court

was correct in not allowing Good Shepherd to present the reasonable accommodation theory to the jury, it follows that the district court was correct in not instructing the jury on this theory.

Good Shepherd's second claim is that the district court erred in not providing the jury with the following instruction:

> Plaintiffs are not required to show that Defendant City of Momence intended to discriminate in order to establish Plaintiff's claim in count 1 under the Fair Housing Act. Plaintiffs must only prove by a preponderance of the evidence that Defendant City of Momence violated the Fair Housing Act by showing that Defendants' conduct actually or predictably had a substantial adverse impact on the residents of the group homes.

We review jury instructions to determine if, as a whole, they were sufficient to inform the jury correctly of the applicable law. *Dadian v. Village of Wilmette*, 269 F.3d 831, 839 (7th Cir. 2001). The district court correctly decided that Good Shepherd's proposed instruction was deficient because it did not contain a statement that the adverse impact of the alleged conduct had to arise because of the residents' handicap. The district court made note of this and Good Shepherd requested leave to tender an amended instruction. Good Shepherd never did so. They are therefore stuck arguing for the instruction as initially proposed. And we agree that the proposed instruction is deficient. It is too broad. The instruction as proposed would encompass almost any housing regulations the city chose to implement. Additionally, even if the instructions actually given failed, as Good Shepherd claims, to instruct the jury on discriminatory effect, this was not an error. For the same reasons that this is not a reasonable accommodation case, it is not a discriminatory effect

case and therefore the jury could not have found in favor of Good Shepherd on a claim of discriminatory effect. The adverse discriminatory effect alleged by Good Shepherd arose from the city's act of shutting off their water. This is essentially the same argument that Good Shepherd made when they claimed that the city had a duty to reasonably accommodate them by turning their water back on. Just as we said in that context, water is something that is used by everyone, and therefore the act of shutting off the water did not adversely affect the developmentally disabled adults by reason of their handicap. In fact, given the specifics of this case, there can be no discriminatory effect if there was no discriminatory intent. Because a lack of water prevents anyone from accessing a residence, the only way Good Shepherd could have proven discriminatory effect would have been to show that the city would not have shut off the water of similarly situated non-disabled residents. If they had done that, they would have proven discriminatory intent. The district court therefore correctly viewed this as a discriminatory intent case and did not err in refusing Good Shepherd's proposed instruction.

## III. Conclusion

Cutting off someone's water does not affect disabled persons differently from non-disabled persons, and so Good Shepherd was appropriately prevented from proceeding under a theory of failure to provide reasonable accommodation. Furthermore, the district court did not err in excluding the testimony of Susan Connor or in instructing the jury. The judgment of the district court is therefore AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*