In the
United States Court of Appeals
For the Seventh Circuit

Nos. 00-2674 & 00-2757

George Dadian and Astrid Dadian,

Plaintiffs-Appellees,

v.

Village of Wilmette,

Defendant-Appellant.

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 98 C 3731--David H. Coar, Judge.

Argued February 23, 2001--Decided October 18, 2001

Before Flaum, Chief Judge, Ripple, and
Williams, Circuit Judges.

Williams, Circuit Judge.  George and
Astrid Dadian wanted to reconstruct their
home with an attached, front garage. A
local ordinance allowed a permit for a
front driveway when 50% of the homes on
the homeowner's block already had front
or side driveways, or when the homeowner
could demonstrate a hardship. Only six of
sixteen homes on the Dadians' block had
front or side drives, so they petitioned
pursuant to the hardship exception
claiming they had problems with walking
(Mrs. Dadian has osteoporosis and asthma,
and Mr. Dadian has orthopedic problems).
The Village trustees in a 5-2 vote denied
the permit because, among other reasons,
they believed Mrs. Dadian's problems with
"twisting and turning" would create a
safety hazard to the small children on
the block. The Dadians sued the Village
for disability discrimination under Title
II of the Americans with Disabilities
Act, 42 U.S.C. sec. 12131 et seq.
("ADA"), and the Fair Housing Amendments
Act of 1988, 42 U.S.C. sec. 3601 et seq.
("FHAA"), and for a denial of equal
protection and substantive due process
under 42 U.S.C. sec. 1983./1 The case
went to trial before a jury, which
rendered a verdict in favor of the
Dadians. Because we find that there was
sufficient evidence to support the jury's

verdict and no error in the jury instructions or evidentiary rulings, we affirm.

I.  BACKGROUND

  A.  Facts

  The Dadians, who are in their mid-70's, have lived in their current house with a detached garage in Wilmette, Illinois, since 1959. Mrs. Dadian has had problems walking for nine years due to osteoporosis and she also suffers from asthma. She has been confined to a wheelchair in the past, but currently works 2-3 days a week. Mr. Dadian also claims to have problems walking, and works as a real estate agent approximately 6 days a week. Because of their health problems, they hired an architect to design a one-story house on their lot with rooms and hallways wide enough for a wheelchair. The design also included an attached, front garage with a 30-foot driveway. An attached, rear garage would have required an 80-foot driveway, but because Mrs. Dadian has problems twisting and turning for long distances, they believed that the front garage was the best alternative.

  In conjunction with the proposed redesign of their house, in 1994, the Dadians sought a 6" side variance from the Village, which was approved, and a curb cut for a front driveway. The Village's Board of Trustees ("Board") denied the request for a curb cut pursuant to a local ordinance that prohibited front or side driveways when less than 50% of the houses on a block had them; only six of sixteen houses on the Dadians' block had front or side driveways. In 1997, the ordinance was amended to include a "hardship exception."/2 The Dadians reapplied for a front driveway permit in 1998.
  The Board held a meeting to determine whether to grant the permit. They heard from the Dadians' lawyer and read reports from two doctors detailing the extent of Mrs. Dadian's physical impairments. The doctors indicated that the front driveway would be better than a rear one because Mrs. Dadian was able to twist and turn for shorter distances. The Board also heard from residents in the neighborhood. A next-door neighbor asserted that he was concerned about the possible loss of

trees but was willing to support the Dadians, while another neighbor mentioned that he thought front garages were unsightly. One neighbor appeared in-person at the hearing and stated that she was concerned about the safety of small children.

Three members of the Board expressly stated that they were concerned about whether Mrs. Dadian could safely back out of a driveway and not cause injury to small children on the block. Because of the Board's safety concerns about her backing out a front driveway, the Board proposed that the Dadians construct an attached, rear garage with a turnabout (this was not an accommodation because the Dadians did not need a curb cut permit to construct a rear driveway). The Dadians rejected the proposal on the grounds that it would require almost complete loss of the grass in the backyard and give the backyard a "parking lot feel." The Board voted 5-2 to deny the permit for the front driveway.

B.  District Court Proceedings

The Dadians sued the Village for disability discrimination and a denial of equal protection and substantive dueprocess. The case went to trial before a jury who heard testimony from multiple witnesses, including both of the Dadians and their doctor. The jury also viewed a videotape of the Board's meeting. At the close of the evidence, the Village filed a motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50. The district court granted the Village's motion on the equal protection and substantive due process claim, but denied the motion as to the claims premised on the Village's violation of the ADA and FHAA. The jury rendered a verdict for the Dadians on the remaining claims, and the Village timely filed a motion for judgment notwithstanding the verdict, or alternatively, for a new trial. The court denied the Village's motion and enjoined the Village from enforcing, or endeavoring to enforce, the ordinance against the Dadians to prevent them from constructing a house with an attached, front garage. The Village appeals from the jury verdict, the district court's denial of its motion for judgment notwithstanding the verdict or

alternatively for a new trial, and the entry of the injunction.

## II.  ANALYSIS

On appeal, the Village argues that the Dadians failed to prove that: 1) they were disabled, 2) the Village did notreasonably accommodate their disabilities, and 3) the Village intentionally discriminated against them because of their disabilities. The Village also contends that the jury instructions improperly placed the burden of proof on the Village as to whether Mrs. Dadian posed a direct threat to the safety of others, and that various evidentiary rulings at trial were improper. We address and reject each argument in turn.

### A.  Disability discrimination

Since the Village's motion for judgment as a matter of law (directed verdict) was denied on the same grounds challenged on appeal, we interpret the Village's argument as a challenge to the court's denial, so our review is de novo. See Hasham v. California State Bd. of Equalization, 200 F.3d 1035, 1043 (7th Cir. 2000). But, because there was a jury verdict, we are "limited to deciding only whether the evidence presented at trial, with all the reasonable inferences drawn there from, 'is sufficient to support the verdict when viewed in the light most favorable to the [plaintiff].'" Id. (citation omitted and alteration in original). "We will overturn a jury verdict for the plaintiff only if we conclude that 'no rational jury could have found for the plaintiff.' Indeed, this standard is applied 'stringently in discrimination cases where witness credibility is often crucial.'" Id. (internal citations omitted).

#### 1.  Evidence of the Dadians' disabilities.

The Village's first argument is that the Dadians did not establish a prima facie case under the McDonnell Douglas method of proof because they did not prove that they were disabled. We are baffled as to why the Village is arguing about the application of McDonnell Douglas because

once the case has been decided on the merits, the McDonnell Douglas framework drops out of the analysis. See United States Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 714-15 (1983); Hasham, 200 F.3d at 1044. After trial, the issue becomes whether the jury's verdict is against the weight of the evidence, see Knox v. State of Indiana, 93 F.3d 1327, 1334 (7th Cir. 1996), with the focus being on whether there was sufficient evidence on the ultimate question of discrimination. Hasham, 200 F.3d at 1044; Heerdink v. Amoco Oil Co., 919 F.2d 1256, 1259-60 (7th Cir. 1990). Therefore, we recast the Village's argument as a challenge to the sufficiency of the evidence as to whether the Dadians' impairments rendered them disabled.

Title II of the ADA and the FHAA prohibit housing discrimination because of a person's disability or handicap./3 Both acts provide that a person is disabled, or handicapped, if she has 1) a mental or physical impairment that substantially limits a major life activity, 2) a record of such an impairment, or 3) is regarded as having such an impairment. 42 U.S.C. sec. 12102(2); 42 U.S.C. sec. 3602(h). Because both acts contain the same definition, we use the terms disabled and handicapped interchangeably throughout the opinion, and construe them consistently with each other. See Bragdon v. Abbott, 524 U.S. 624, 631 (1998). Whether a plaintiff has an impairment and whether it substantially limits a major life activity is to be decided on a case-by-case basis. Byrne v. Bd. of Educ., Sch. of West Allis-West Milwaukee, 979 F.2d 560, 565 (7th Cir. 1992).

The jury heard testimony from one doctor and both of the Dadians about the disabling and degenerative nature of Mrs. Dadian's osteoporosis. Dr. Semerjian testified that Mrs. Dadian's osteoporosis caused her to have a femur fracture, a total knee replacement, compression fractures of her vertebrae, and degenerative disease of the joints. He further testified that these problems substantially limited her ability to walk (a major life activity). Mrs. Dadian testified that her osteoporosis created problems with her sense of balance and that she had to hold onto the rails on

her stairwell to pull herself up the stairs leading to her bedroom. She also stated that although she could walk the 80 feet from her rear garage to her home, she does so "very slowly" and "carefully." Even so, she has fallen and fractured her femur on this walk. Mr. Dadian also testified to the problems Mrs. Dadian has walking due to her osteoporosis.

In light of the procedural posture of this case, it is not our role to come to a decision as to whether either of the Dadians was disabled under the ADA or FHAA. Rather, we only need to decide after reviewing the testimony in the light most favorable to the Dadians whether there was sufficient evidence for a reasonable jury to come to such a conclusion. Keeping in mind the jury's ability to assess the Dadians' credibility, we believe there was sufficient evidence to find that Mrs. Dadian's osteoporosis rendered her disabled. We also recognize that the evidence could have led reasonable men and women to reach different verdicts; therefore, we also conclude that the court was correct not to grant the Village's motion for a directed verdict./4

Because the permit sought by the Dadians and the requirements of the FHAA require only one of the Dadians to be disabled, we do not consider whether Mr. Dadian could be considered disabled (although we express our doubt as to whether a reasonable jury could have so concluded).

2.  Failure of the Village to reasonably accommodate.

The Village's next argument is that even if the Dadians were disabled, there was insufficient evidence that the Village failed to reasonably accommodate their disabilities. A violation of either act can be established by showing that the plaintiff was a qualified individual with a disability, and the defendant either failed to reasonably accommodate the plaintiff's disability or intentionally discriminated against the plaintiff because of her disability. Washington v. Indiana High Sch. Athletic Ass'n, Inc., 181 F.3d 840, 846-48 (7th Cir. 1999). The Dadians proceeded to trial under both

theories. Because we find that there was sufficient evidence to support a jury verdict under the failure to reasonably accommodate theory, we affirm the court's entry of judgment in favor of the Dadians and denial of the Village's motion for judgment notwithstanding the verdict.

A public entity must reasonably accommodate a qualified individual with a disability by making changes in rules, policies, practices or services, when necessary. 42 U.S.C. sec. 12131(2); 42 U.S.C. sec. 3604; see Washington, 181 F.3d at 847-48. Whether a requested accommodation is reasonable is highly fact-specific, and determined on a case-by-case basis by balancing the cost to the defendant and the benefit to the plaintiff. Bronk v. Ineichen, 54 F.3d 425, 429 (7th Cir. 1995); United States v. Village of Palatine, Illinois, 37 F.3d 1230, 1234 (7th Cir. 1994). Whether the requested accommodation is necessary requires a "showing that the desired accommodation will affirmatively enhance a disabled plaintiff's quality of life by ameliorating the effects of the disability." Bronk, 54 F.3d at 429. The overall focus should be on "whether waiver of the rule in the particular case at hand would be so at odds with the purposes behind the rule that it would be a fundamental and unreasonable change." Washington, 181 F.3d at 850. See also 28 C.F.R. sec. 35.130(b)(7) and (8).

The jury heard testimony about the costs to the Village in granting the front driveway permit, which included zoning and land-use concerns but minor administrative costs, and about the needs of the Dadians, which included the need for Mrs. Dadian to avoid twisting and turning and walking for long distances. The jury also heard from an architect and appraiser that an attached, front garage was a better fit with the new home design than an attached, rear garage with a turnabout because of the "parking lot feel" and implicit loss of aesthetics and decreased home value that a turnabout would create. Because six of the sixteen homes on the block already had curb cuts (via front or side driveways), a reasonable jury could have found that the Dadians' request was not at odds with the purpose behind the ordinance and would not cause a fundamental or unreasonable change to the ordinance. This is

particularly so because the Dadians were not requesting a change to the ordinance itself, but application of the hardship exception to their case. On the other hand, a reasonable jury could have concluded that the Village's permanent loss of property outweighed the Dadians' needs because an attached, rear garage with a turnabout would have satisfied their needs and the Dadians should bear the burden of the resulting decreased home value, and not the Village.

Thankfully, we are not a zoning court and our job is not to reweigh the evidence before the jury. Because reasonable men and women could have reached different verdicts, the court was correct not to grant the Village's motion for judgment as a matter of law, and when the evidence is viewed in the light most favorable to the Dadians, the jury's verdict should be sustained.

Because we find that there was sufficient evidence for a jury to conclude that the Village failed to reasonably accommodate the Dadians, we do not consider the Village's alternative argument that there was insufficient evidence that it intentionally discriminated against the Dadians.

B. Jury Instructions

The Village also argues that the district court erroneously instructed the jury that the Village had the burden of proof as to whether Mrs. Dadian constituted a direct threat to safety, so a new trial is warranted./5

We disagree and find that the court properly instructed the jury. We review jury instructions to determine if, as a whole, they were sufficient to inform the jury correctly of the applicable law. Mayall v. Peabody Coal Co., 7 F.3d 570, 573 (7th Cir. 1993). And, we will reverse a jury verdict only if we find the error is not harmless, i.e., affected the substantial rights of the parties. Fed. R. Civ. P. 61; Crabtree v. Nat'l Steel Corp., 261 F.3d 715, 719 (7th Cir. 2001).

The Village maintained that it did not grant the Dadians' request for a front driveway permit because, among other reasons, the Board believed that Mrs. Dadian posed a direct threat to the

safety of others. In connection with this asserted reason, the district court instructed the jury that with regard to the Dadians' intentional discrimination claim:

The Fair Housing Act and the Americans with Disabilities Acts also prohibit Wilmette from making a permit decision, "because of" a citizen's handicap unless Wilmette can prove that resident, because of his or her handicap, poses a legitimate threat to the health and safety of others.

The court also instructed:

In order to prevail on [the intentional discrimination] claim, Plaintiffs must establish that the Defendant's refusal to grant a front driveway permit was based upon a discriminatory motive. As applied to this case, Plaintiffs must establish that Astrid Dadian was a person who was physically disabled or handicapped, and that the Village took that into consideration in denying the permit.

For purposes of this determination, you may consider the Village's defense that Mrs. Dadian was not qualified to operate a vehicle using a front driveway and that the refusal was not based upon discrimination but rather on safety concerns. As to this defense, the burden of proof is on the Village to prove by a preponderance of the evidence, that Astrid Dadian's use of a front driveway posed a legitimate safety risk.

We find no reversible error in the instruction given./6 First, the text and legislative history of the FHAA support imposing the burden of proof on the public entity that asserts safety as a defense to a disability discriminationaction. The FHAA provides that "nothing in this subsection requires that a dwelling be made available to an individual whose tenancy would constitute a direct threat to the health or safety of other individuals." 42 U.S.C. sec. 3604(f)(9). The legislative history shows that this section was intended to incorporate the standard articulated by the Supreme Court in School Bd. of Nassau County, Florida v. Arline, 480 U.S. 273, 288 n.16 (1987), that an individual is not "otherwise qualified" if she poses a threat to the safety of others unless the

threat can be eliminated by reasonable accommodation. H.R. Rep. No. 100-711, at 28-30 (1988), reprinted in 1988 U.S.C.C.A.N. 2173, 2190. In Arline, the Court held that to determine if an individual was "otherwise qualified" required an individualized inquiry and should not be "based on prejudice, stereotypes, or unfounded fear . . . ." Arline, 480 U.S. at 287. Thus, to comport with Arline, sec. 3604(f)(9) was enacted "to require that the landlord or property owner establish that there is a nexus between the fact of the individual's tenancy and the asserted direct threat." H.R. Rep. No. 100-711, at 29 (emphasis added). The legislative history goes on to state that "[i]f the landlord determines, by objective evidence that is sufficiently recent as to be credible, and not from unsubstantiated inferences, that the applicant will pose a direct threat to the health or safety of others, the landlord may reject the applicant as a tenant." Id. at 30 (emphasis added). Based on these statements, we conclude that a public entity that asserts the reason it failed to accommodate a disabled individual was because she posed a direct threat to safety bears the burden of proof on that defense at trial.

Second, Titles I (employment) and III (public accommodations) of the ADA have been interpreted to place the burden of proof on the defendant. Although Title II of the ADA, the chapter at issue here, does not contain a direct threat provision, we have held that the methods of proving discrimination under Titles I and III should also apply to Title II. Washington, 181 F.3d at 848 (relying on the legislative history of Title II). 42 U.S.C. sec. 12113, the employment chapter of the ADA, specifically provides that:

It may be a defense to a charge of discrimination under this Act that an alleged application of qualification standards . . . that . . . den[ies] a job or benefit to an individual with a disability has been shown to be job-related and consistent with business necessity . . . . The term "qualification standards" may include a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace.

We have interpreted this provision to

mean that it is the employer's burden to show that an employee posed a direct threat to workplace safety that could not be eliminated by a reasonable accommodation. EEOC v. AIC Security Investigations, Ltd., 55 F.3d 1276, 1283–84 (7th Cir. 1995). Accord Bd. of Trustees of the University of Alabama v. Garrett, 531 U.S. 356, 121 S. Ct. 955, 960 (2001) (holding that it is the employer's duty to prove that it would suffer an undue burden by accommodating the plaintiff, as opposed to "requiring (as the Constitution does) that the complaining party negate reasonable bases for the employer's decision.").

Likewise, the public accommodations chapter of the ADA has been interpreted in a manner consistent with placing the burden of proof on the defendant. 42 U.S.C. sec. 12182(b)(3) contains language similar to that found in the FHAA ("Nothing in this subchapter shall require an entity to permit an individual to participate in or benefit from the goods, services, facilities, privileges, advantages and accommodations of such entity where such individual poses a direct threat to the health or safety of others."). This provision was interpreted by the Supreme Court in Bragdon v. Abbott, 524 U.S. 624 (1998), to mean that a dentist who refused to treat a patient with HIV in his office "had the duty to assess the risk of infection based on the objective, scientific information available to him and others in his profession." 524 U.S. at 649.

We find the legislative history of 42 U.S.C. sec. 3604(f)(9) and the reasoning of courts interpreting the direct threat provisions under Titles I and III of the ADA persuasive. And we hold that the district court did not err in imposing the burden of proof on the Village to demonstrate by a preponderance of the evidence that the Board denied the Dadians a front driveway permit because Mrs. Dadian posed a direct threat to the safety of others./7 Therefore, we see no reason to order a new trial.

C. Various Evidentiary Rulings

The Village's final challenge is to the district court's admission of various pieces of evidence, including an

appraisal and testimony regarding the decreased value of the house if a rear driveway with a turnabout was constructed, evidence of the reasons behind the enactment of the ordinance, and a memorandum explaining the Director of Public Works' initial approval of the permit application in 1994. We review challenges to evidentiary rulings for abuse of discretion and will not reverse a jury verdict if the error is harmless. Fed. R. Civ. P. 61; Rehling v. City of Chicago, 207 F.3d 1009, 1017 (7th Cir. 2000). We find no abuse of discretion in the admission of this evidence because it was either relevant for impeachment purposes or to establish the necessity element of a reasonable accommodation claim. And, if there was error, it was harmless considering the marginal importance of this evidence in light of the jury's ability to assess the credibility of the Dadians, to hear from a doctor about the nature of Mrs. Dadian's impairment, and to view the videotape of the Board's meeting.

## III. CONCLUSION

For the foregoing reasons, the judgment of the district court is affirmed.

FOOTNOTES

/1 The Dadians also sued two officials in their individual capacities, whose dismissal from the suit is not challenged on appeal, and also brought several state law claims for equitable relief.

/2 The ordinance provides that relief from the strict application of the ordinance shall be granted if the petitioner demonstrates that:

(A) The particular physical conditions, shape, or surroundings of the property would impose upon the owner a practical difficulty or particular hardship, as opposed to a mere inconvenience, if the requirements of Section 16-10.5 were strictly enforced; and,

(B) The plight of the property owner was not created by the owner and is due to unique circumstances associated with the property itself; and,

(C) The difficulty or hardship is peculiar to the property in question and is not generally shared by other properties in

the same 'neighborhood,' . . .; and,

(D) The difficulty or hardship resulting
from the strict application of the stan-
dards set forth . . . would prevent the
owner from making a reasonable use of that
the [sic] property; however, the fact the
property could be utilized more profitably
with the requested relief than without the
requested relief shall not be considered
as grounds for granting the requested
relief; and,

(E) The proposed driveway will not create
an unusual danger to pedestrians or other
users of the public sidewalk and/or park-
way, or otherwise endanger the public
health, safety and welfare; and,

(F) The proposed driveway will not require
the removal, relocation or disruption of
public facilities or public utilities, or
require the removal of parkway trees of
such a size that they cannot be replaced
with compensatory plantings of substantial-
ly the same diameter or size . . . .

Strict application of the ordinance was also not
required when it would be inconsistent with
federal or state laws, or there were unusual
circumstances affecting the property or the
owners that would create a substantial and unusu-
al hardship on the owners.

/3 Title II of the ADA provides: "No qualified
individual with a disability shall by reason of
such disability be excluded from participation in
or be denied the benefits of the services, pro-
grams, or activities of a public entity, or be
subjected to discrimination by any such entity."
42 U.S.C. sec. 12132. The FHAA provides: "It
shall be unlawful to discriminate against any
person in the provision of services or facilities
in connection with such dwelling because of a
handicap of that person or any person associated
with that person." 42 U.S.C. sec. 3604(f)(2).

/4 Because a plaintiff only has to suffer from one
impairment to be considered disabled, we do not
need to determine if the jury could have also
found that Mrs. Dadian's asthma constituted a
disability.

/5 Again, the Village relies on the McDonnell Doug-
las burden-shifting method of proof, which as we
stated earlier, does not apply after there has
been a judgment on the merits.

/6 We do find that the district court erred in
limiting the direct threat defense to the inten-

tional discrimination claim. Whether an individual is "otherwise qualified," i.e., poses a direct threat to the safety of others, is also relevant to a plaintiff's failure to reasonably accommodate claim. School Bd. of Nassau County, Florida v. Arline, 480 U.S. 273, 288 n.16 (1987); H.R. Rep. No. 100-711, at 28-29 (1988), reprinted in 1988 U.S.C.C.A.N. 2173, 2190; 28 C.F.R. sec. 36.208. The error was harmless, however, because the jury's verdict in favor of the Dadians shows that it did not believe that Mrs. Dadian posed a direct threat to the safety of others under either theory.

/7 Unlike what the Village urges, this result does not conflict with Bekker v. Humana Health Plan, Inc., 229 F.3d 662 (7th Cir. 2000), in which we agreed with the district court that the terminated employee, a doctor who was suspected of abusing alcohol, had to prove that she was a qualified individual, i.e., performing the essential functions of her job, to make out a prima facie case under the McDonnell Douglas framework. Because of the nature of her job, whether she posed a direct threat to the health or safety of her patients was intertwined with her qualifications. In this case, we are at a different decisional posture, and as stated above, McDonnell Douglas drops out of the analysis once a decision on the merits has been reached. Moreover, the Village does not contend that being able to twist and turn for long distances was a prerequisite to satisfying the permit requirement.