**Charles STEINES, a Minor, by his Parents and Natural Guardians, Ann Munson STEINES and Michael Steines, Plaintiffs,**

**v.**

**OHIO HIGH SCHOOL ATHLETIC ASSOCIATION, Defendant.**

**Case No. 1:14CV525.**

United States District Court,
S.D. Ohio,
Western Division.

Filed Nov. 10, 2014.

John Patrick Concannon, Katherine Daughtrey Neff, Randolph Harry Freking, Freking & Betz, LLC, Cincinnati, OH, for Plaintiffs.

Steven L. Craig, Canton, OH, for Defendant.

**ORDER GRANTING PRELIMINARY INJUNCTION**

SUSAN J. DLOTT, Chief Judge.

This matter comes before the Court on Plaintiffs' Motion for a Preliminary Injunction. (Doc. 2.) The Court held a hearing on Plaintiffs' motion on July 30, 2014. Plaintiffs request an order preventing Defendant Ohio High School Athletic Association ("OHSAA") from enforcing its instate residency requirement, found in OHSAA Bylaw 4–6–3, as to Charles Steines, a ninth grade student at The Summit Country Day School in Cincinnati, Ohio who, despite residing in Kentucky, has attended school in Cincinnati, Ohio since being diagnosed with a learning disability prior to the first grade, and who merely seeks the opportunity to play soccer with his class- mates while attending high school. For the reasons that follow, the Court GRANTS Plaintiffs' Motion and hereby preliminarily enjoins Defendant OHSAA from enforcing or threatening or seeking to enforce OHSAA BYLAW 4–6–3 against Plaintiffs.

## I. BACKGROUND [1]

This case concerns the eligibility of one ninth grade student, Charles Steines ("Charles"), to play soccer at his high school. Charles and his parents, Ann and Michael Steines ("the Steines"), brought this lawsuit in response to the OHSAA's refusal to grant an accommodation or waiver of the OHSAA's instate residency requirement to permit Charles, an individual with a disability, to play interscholastic sports. Plaintiffs allege that under the circumstances, the OHSAA's refusal to grant the requested accommodation amounts to a violation of the Rehabilitation Act of 1973 and the Americans with Disabilities Act. The facts forming the basis of this case are for the most part undisputed.

### A. Charles' Education

Though Plaintiffs Charles, Ann, and Michael Steines are residents of Villa Hills, Kentucky, Charles has attended school in Ohio since the first grade. The Steines' decision to enroll Charles in school in Ohio rather than in Kentucky, like his sister who currently attends parochial school in the Steines' parish district, was prompted by a desire to send Charles to a school best equipped to address his learning disabilities. Charles began displaying symptoms of those disabilities as early as kindergarten. During that year, the Steines noticed that Charles often came home from school exhausted and unhappy. Seeking an explanation, they had Charles

1. Unless otherwise specified, the facts addressed herein are gleaned from the Verified Complaint and the testimony offered at the preliminary injunction hearing.

tested, and he was diagnosed with Attention Deficit Hyperactivity Disorder and an auditory processing issue in February 2005.

After receiving the diagnosis, the Steines learned of the Springer School and Center ("Springer") in Cincinnati, Ohio. Springer is one of fewer than two dozen schools nationwide that offers an education for grades one through eight exclusively to children with learning disabilities. As a result, Springer draws students from Ohio, Kentucky, and Indiana. A number of factors convinced the Steines that Springer would be the best educational setting for Charles. First, the class sizes at Springer are small (approximately nine to thirteen students per class) and there are two full time teachers assigned to each class, meaning the students receive more individualized attention than they would in a general classroom setting. Additionally, according to Michael Steines, the children at Springer do not appear to be self-conscious about their learning disorders because they attend school with other children facing the same hurdles. Finally, Springer tailors its teaching methods and learning techniques toward each child's specific learning disabilities.[2]

The Steines enrolled Charles in first grade at Springer for the 2005/2006 school year. While Charles attended Springer, the school provided the Steines with detailed progress reports at the end of each semester[3] and held parent/teacher conferences each December, at which time Springer staff made recommendations as to whether Charles should continue at Springer for the next school year. During Charles' sixth grade year, the teachers and staff at Springer opined that Charles could attend a mainstreamed school for the seventh grade but that he would need additional educational support to succeed. Accordingly, the Steines once again researched different schools in the greater Cincinnati and northern Kentucky area. They ultimately concluded that St. Ursula Villa in Cincinnati would be the best fit for Charles for seventh and eighth grade.

Like Springer, St. Ursula Villa has small class sizes. There are only forty students per grade, and many of Charles' classes had only six to eight students. The Steines believed the educational services offered at St. Ursula Villa were on par with those at Springer. The school permits the use of laptops in class, an educational aide that had proven useful to Charles at Springer. The school also offers a course called "Communication Arts," in lieu of a foreign language class, which is supervised by a learning intervention specialist and which is devoted to helping disabled students review challenging material, organize homework, and prepare for tests. Finally, St. Ursula Villa has a strong reputation for academics, and the Steines found the school's environment welcoming.

During Charles' eighth grade year at St. Ursula Villa, the Steines conducted a thorough review of the high schools in both southern Ohio and northern Kentucky. They determined that The Summit Country Day School ("Summit") in Cincinnati, Ohio was most similar to St. Ursula Villa in that Summit has small class sizes, a resource program similar to the Communication Arts program at St. Ursula Villa, a technology platform that permits and supports the use of laptops and electronic notebooks, and a strong reputation for academics. Finally, Summit offers a college

---

**2.** For example, Michael Seines testified, Charles' reading comprehension improves when he is able to simultaneously listen to an auditory stream of the material he is reading.

**3.** For an example of the reports Charles received, *see* Preliminary Injunction Hearing Joint Exhibit 2.53–2.62.

guidance program that is considered among the best in Cincinnati, something the Steines believed would be a key benefit for Charles. Accordingly, the Steines enrolled Charles in Summit, and he began high school there in the fall of 2014.

## B. Participation in Soccer

The Steines maintain that throughout childhood, Charles' participation in sports in general and in soccer in particular has positively impacted his social skills, self-image, behavior, attendance at school, and academic performance. While Charles attended St. Ursula Villa he played on the school's soccer team.[4] He also played club, or "Select," soccer for one year from July 2013 through May 2014.

Charles would like to continue playing soccer with his high school classmates while at Summit.[5] Because soccer activities occur throughout the summer, the Steines began looking into whether Charles could play soccer for Summit while he was finishing his eighth grade year at St. Ursula Villa. Summit is a member of the OHSAA, a nonprofit,[6] voluntary, unincorporated association of approximately 828 public and private high schools and middle schools. (Ross Dep. 40, Doc. 11 at PageID 144.) Eighty-two to eighty-three percent of the member schools are public. (Ross Dep. 40, Doc. 11 at PageID 144.)

Member schools' athletic programs are governed by the OHSAA's bylaws, which were voted on and adopted by the member schools' representatives. The OHSAA's Board of Directors has the power to propose amendments to the bylaws through a referendum process.[7] (Ross Dep. 28–29, Doc. 11 at PageID 141–42.) Under certain circumstances, the Board also can bypass the referendum process to make temporary changes to the bylaws to bring them into conformance with state and federal law until more permanent amendments can be proposed and voted on during the next referendum cycle. (See Ross Dep. 29, 37, Doc. 11 at PageID 142, 144.)

OHSAA Bylaw 4–6–3, appearing in the section of the bylaws pertaining to "Student Eligibility," provides that students "whose parents reside outside the state of Ohio will be ineligible for interscholastic athletics in a member school" (hereinafter referred to as "Bylaw 4–6–3" or "the In-state Residency Rule"). (Doc. 2–1 at PageID 36.) When asked to explain the purpose of that rule, OHSAA Assistant Commissioner Roxanne Price testified that it promotes an equal playing field by preventing unfair recruitment of the best players, generally by private schools.

---

4. St. Ursula Villa is not a member of the OHSAA.

5. Charles has already met several other students who play soccer for Summit, and he participated in showcase scrimmages and attended soccer camp at Summit this summer.

6. Price Dep. 27, 29, 31–32, Doc. 12 at PageID 156–57 (testifying that the Association is a nonprofit organization that derives its funding from corporate sponsors, tournament admission fees, and dues from game officials or referees).

7. The referendum process occurs annually, beginning in August when the OHSAA Board meets for its first work session of the year.

Between August and December, the Board discusses any issues that arose over the prior year that might be ripe for submission as a referendum item. Then, between December and February, the Board votes to determine which proposed items will appear on the ballot, and by March, the Board finalizes the ballot. In April and May, the board members attend regional meetings to discuss the ballot items. During the first two weeks of May, OHSAA member schools vote and approved changes are made to the bylaws and constitution. (Ross Dep. 28–29, Doc. 11 at PageID 141–42.)

(Price Dep. 42–45, Doc. 12 at PageID 160–61.)

There are ten exceptions to the Instate Residency Rule, covering a variety of scenarios, the most pertinent of which in this context are Exceptions 3 and 4. Exception 3 provides that "[a] student who enrolls at first grade level in a school consisting of grades 1–12 and who maintains continuous enrollment shall be eligible for interscholastic athletics in grades 7–12 in that school regardless of place or state of residence of parents." (Doc. 2–1 at PageID 36.) Price testified that the term "school" in that exception actually refers to a school *system* or *district,* and that the exception therefore would include any public or non-public school system that offers education from grades one through twelve. (Price Dep. 52–55, 61–64, Doc. 12 at 162–63, 165.) Exception 4 recognizes that there are certain parochial school systems in Ohio that bleed across state lines into neighboring states and applies to students who reside outside the state border but within the limits of one of those school systems:

> A student who resides within the boundaries of a parochial school system consisting of grades 1–12 that has multiple sites organized into elementary schools (1–8) and secondary schools (9–12), and who has enrolled by fourth grade level of an elementary school in that system and has maintained continuous enrollment in that school system through grade 8, shall be eligible for interscholastic athletics in grades 9–12 providing the secondary school attended by the student is the school designated by the school system for the continuance of the student's educational program.

(Doc. 2–1 at PageID 36.) Although he has attended school in Ohio since the first grade due to his learning disabilities, none of the current exceptions apply to Charles. One of the reasons neither Exception 3 nor Exception 4 applies because Springer is not part of any school district or system.

The Steines discussed the potential eligibility issue with Summit's Athletic Director, Greg Dennis, shortly after deciding to send Charles to that school. In early February 2014, Dennis reached out to Daniel B. Ross, Ph.D., Commissioner of the OHSAA, to request an accommodation to the Instate Residency Rule for Charles. (*See* Preliminary Injunction Hearing Joint Exhibit 1.6.) Dennis attached a letter from the Steines to his request. In their letter, the Steines outlined Charles' learning disabilities, his attendance at Springer and the positive impact athletics has played on his social skills and self-image. They also noted their understanding that OHSAA Bylaw 4–6–3 does not include an exception for students diagnosed with learning disabilities. Dr. Ross forwarded the request to Assistant Commissioner Price, who is in charge of evaluating eligibility issues. (*Id.* Ex. 1.5.) Although she later admitted she had no concerns about improper or unfair recruitment efforts in Charles' case (Price Dep. 65, Doc. 12 at PageID 166), Price denied the request for accommodation on the basis that none of the exceptions to the Instate Residency Rule applied to Charles. The Steines formally were notified of the denial via a letter dated February 24, 2014 from Price. Consistent with the explanation reflected in that letter, Price subsequently testified that she bases eligibility determinations solely on the bylaws and cannot take any action not specifically permitted by the bylaws. In other words, even if a child has a potentially sound reason for requesting an accommodation or waiver of an eligibility requirement, Price has no power to deviate from the bylaws.

After receiving Price's letter, the Steines contacted the OHSAA again in March, pleading for a disability accommo-

dation and requesting that the OHSAA reconsider its position. Receiving no response, the Steines yet again reached out to Dr. Ross on April 3, 2014, copying the OHSAA's Board of Directors and Diversity Committee on the correspondence. Sometime thereafter, Dr. Ross spoke with Mark Steines and suggested the possibility of proposing an amendment to the bylaws for the 2015 referendum, but he offered no solution for the 2014 school year. (Ross Dep. 30–31, Doc. 11 at PageID 142.) Accordingly, the Steines filed the instant suit.

## II. LEGAL STANDARD

 Plaintiffs' motion is governed by Fed.R.Civ.P. 65. The decision whether or not to grant a request for interim injunctive relief falls within the sound discretion of the district court. *Friendship Materials, Inc. v. Michigan Brick, Inc.*, 679 F.2d 100, 102 (6th Cir.1982). A district court is to consider the following four factors when deciding to issue a temporary restraining order: (1) whether the movant has demonstrated a strong likelihood of success on the merits; (2) whether the movant would otherwise suffer irreparable injury; (3) whether issuance of preliminary injunctive relief would cause substantial harm to others; and (4) whether the public interest would be served by issuance of preliminary injunctive relief. *See Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir.2000); *see also Mason Cnty. Med. Ass'n v. Knebel*, 563 F.2d 256, 261 (6th Cir.1977). "[T]he four considerations applicable to preliminary injunctions are factors to be balanced and not prerequisites that must be satisfied.... These factors simply guide the discretion of the court; they are not meant to be rigid and unbending requirements." *In re Eagle–Picher Industries, Inc.*, 963 F.2d 855, 859 (6th Cir.1992) (citations omitted).

## III. ANALYSIS

### A. Strong Likelihood of Success on the Merits

 Plaintiffs allege that the OHSAA bylaws have the effect of discriminating against Steines on the basis of his disability, in violation of the Rehabilitation Act of 1973 and Titles II and III of the Americans with Disabilities Act ("ADA"). For the reasons stated below, the Court finds Plaintiffs demonstrate a strong likelihood of success on their claim under Title II of the ADA, and therefore finds it unnecessary to address the remainder of Plaintiffs' claims.

 Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *See* 42 U.S.C. § 12132. "The term 'qualified individual with a disability' means an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). Because "[t]he analysis of claims under the [ADA] roughly parallels those brought under the Rehabilitation Act ... cases construing one statute are instructive in construing the other." *McPherson v. Michigan High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453, 459–60 (6th Cir.1997) (internal citations and quotation marks omitted).

### 1. Applicability of ADA Title II to the OHSAA

As a threshold issue in addressing the merits of Plaintiffs' ADA claim, the Court

first considers the applicability of Title II to the OHSAA, a question that turns on whether the OHSAA constitutes a "public entity." Included within the definition of "public entity" is "any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C.A. § 12131(1)(B). While arguing that it is not a public entity, the OHSAA concedes that there is "a genuine issue of fact and law as to whether the OHSAA is subject to" Title II. (Doc. 3 at 6, PageID 54.) The Court agrees that there are questions of fact as to the OHSAA's status under the ADA, but finds sufficient evidence in the record to conclude that Plaintiffs likely will succeed at proving the OHSAA is a public entity. More than a decade ago, the United States District Court for the Northern District of Ohio found the OHSAA to be subject to Title II on the following grounds:

> This court notes that every available district court opinion which has addressed this very issue has found that a state athletic association is an instrumentality of the State. *See Hoot v. Milan Area Schs.*, 853 F.Supp. 243, 251 (E.D.Mich.1994); *Sandison v. MHSAA*, 863 F.Supp. 483, 487 (E.D.Mich., 1994), *rev'd in part,* 64 F.3d 1026 (1995); *Dennin v. Connecticut Interscholastic Athletic Conf., Inc.,* 913 F.Supp. 663, 670 (D.Conn.1996) [, *vacated on mootness grounds,* 94 F.3d 96 (1996) ]; *Johnson v. Florida High Sch. Activities Ass'n. Inc.,* 899 F.Supp. 579, 583 (M.D.Fla.1995) [, *vacated on mootness grounds,* 102 F.3d 1172 (1997) ]; *Pottgen v. Missouri State High Sch. Activities Ass'n,* 857 F.Supp. 654, 662 (E.D.Mo.1994), *rev'd,* 40 F.3d 926 (8th Cir.1995). Of particular interest is the opinion of the court in *Hoot.* That Court explained that the Michigan High School Athletic Association is an instrumentality of the state because the MHSAA, a private, nonprofit association that is sanctioned by state law, is the "official association" of the state, has a permanent ex officio member of the State Board on its governing board, and is composed of primarily public schools and "frequently uses public facilities" thus intertwining the MHSAA with state instrumentalities. *Hoot,* 853 F.Supp. at 250–51.
>
> This court does not have the same quality of evidence before it as did the court in *Hoot,* but weighing that evidence which was submitted on this question in the instant case, the court finds that Plaintiff has proven that the Defendant OHSAA is an instrumentality of the State of Ohio. The evidence tends to show that Ohio has delegated a substantial amount of state authority to the OHSAA: the great majority of OHSAA's members are public schools, it frequently uses public facilities, and it exercises the ability to sanction public schools for violations of its rules. The OHSAA is thus an instrument of the State and a "public entity" amenable to suit pursuant to Section 12132.

*Rhodes v. Ohio High Sch. Athletic Ass'n,* 939 F.Supp. 584, 590–91 (N.D.Ohio 1996). No evidence has been brought to light in this case that would call for a different conclusion. Indeed, the facts established in this case are consistent with those in *Rhodes.* For example, OHSAA members include public and nonpublic schools. (Ross Dep. 10, Doc. 11 at PageID 137.) Depending on the school system, some members use public facilities to hold sporting events, and the OHSAA routinely holds tournaments in leased public facilities. The OSHAA sets eligibility standards for students seeking to participate in interscholastic athletic programs at member schools, and the OSHAA board oversees its members' athletic programs and has the power to sanction public schools for violations of OSHAA rules.

Defendant argues that the Court lacks sufficient evidence to definitively evaluate the OHSAA's status. However, that is the reality courts are faced with in most cases in which preliminary injunctive relief is sought. It is precisely due to the timing of such requests that a plaintiff need only show a *likelihood* of success on the merits. As to the question of whether the OHSAA qualifies as a public entity under Title II of the ADA, Plaintiffs have met their burden. *See Rhodes,* 939 F.Supp. at 591; *Illinois ex rel. Madigan v. Illinois High Sch. Ass'n,* 12 C 3758, 2012 WL 3581174, at *4 (N.D.Ill. Aug. 17, 2012) (finding that the plaintiffs had pled facts sufficient to suggest that the Illinois High School Association was a public entity where the complaint alleged that "about 98% of Illinois schools are members of IHSA, that all Illinois public high schools are supported by public taxation and are recognized by the Illinois State Board of Education, and that IHSA oversees those schools' interscholastic high school sports programs in a very detailed manner").

## 2. ADA Title II Claim

In general, to state a claim for discrimination under Title II of the ADA, a plaintiff must allege facts showing: (1) he has a disability; (2) he is otherwise qualified; and (3) he is being excluded from participation in, being denied the benefits of, or being subjected to discrimination under the public entity's services, programs, or activities solely because of his disability. *Santana v. School,* 1:05CV646, 2005 WL 2459265, at *2 (S.D.Ohio Oct. 4, 2005) (citing 42 U.S.C. § 12132 and *Jones v. City of Monroe,* 341 F.3d 474, 477 (6th Cir.2003)). In this case, Plaintiffs argue that the OHSAA violated Title II of the ADA by refusing to grant Charles, who due solely to his disability attends school in Ohio rather than in his home state of Kentucky, an accommodation of the OHSAA's Instate Residency Rule to allow him to play soccer on his high school's team. Defendant's

response hinges on two main arguments. First, Defendant contends that the OHSAA is merely applying a neutral residency requirement that would bar Charles from participation in OHSAA-governed sports programs in Ohio even if he were not disabled. And second, Defendant argues that Charles is not requesting a mere accommodation, but rather a complete waiver of an essential eligibility rule, a step which the ADA does not require. For the purposes of the preliminary injunction analysis, Defendant does not dispute that Charles suffers from a learning disorder that would qualify as a disability under the ADA.

Over the past two decades, a number of student athletes have alleged ADA violations stemming from the application of facially neutral eligibility criteria resulting in their exclusion from school athletic programs. *See generally McPherson,* 119 F.3d at 460; *Sandison v. Michigan High Sch. Athletic Ass'n, Inc.,* 64 F.3d 1026 (6th Cir.1995); *Washington v. Indiana High Sch. Ath. Ass'n,* 181 F.3d 840 (7th Cir. 1999). By adapting precedent stemming from the employment discrimination context, courts have identified three methods by which plaintiffs can prove such claims:

> [D]iscrimination under [Title II of the ADA] may be established by evidence that (1) the defendant intentionally acted on the basis of the disability, (2) the defendant refused to provide a reasonable modification, or (3) the defendant's rule disproportionally impacts disabled people.

*Washington,* 181 F.3d at 847 (relying on the approach outlined by the Sixth Circuit in *McPherson,* 119 F.3d at 460).

The instant case concerns the second approach. In contrast to claims pursued under the first approach, wherein the plaintiff must prove the defendant intentionally acted on the basis of disability,

a plaintiff pursuing a claim via the denial of reasonable accommodation approach need not prove discriminatory intent. *Id.* at 846; *see also Ability Ctr. of Greater Toledo v. City of Sandusky,* 385 F.3d 901, 908–10 (6th Cir.2004) (addressing the scope of Title II). "Title II mandates not only that public entities refrain from intentionally discriminating against disabled individuals but that they also make certain accommodations to the disabled in the course of providing public services." *Ability Ctr.,* 385 F.3d at 908.

Indeed, courts have recognized that discrimination may result from the application of a facially neutral regulation if the defendant could have reasonably accommodated the plaintiff and refused to do so. *See McPherson,* 119 F.3d at 460–61; *Washington,* 181 F.3d at 848–49. In *McPherson,* a student athlete challenged the application of a neutral Michigan High School Athletic Association ("MHSAA") eligibility rule that prohibited any student who had completed eight semesters of high school from any further participation in interscholastic sports. *McPherson,* 119 F.3d at 460–61. The plaintiff had struggled academically throughout school and was ultimately forced to repeat the eleventh grade. After he was held back, he was diagnosed with a learning disability. *Id.* at 456. During his ninth semester in high school (the first semester of his senior year), the plaintiff filed a request with the MHSAA for a waiver of the eight-semester rule so that he could continue to play for his school's basketball team. *Id.* The MHSAA denied the waiver request, and the plaintiff filed a lawsuit, claiming violations of the ADA; the Rehabilitation Act, and an analogous state law. *Id.* at 457–58. In addressing the effect of the eight-semester rule's neutrality on the plaintiff's disability discrimination claims, the Sixth Circuit found what while the plaintiff could not demonstrate intentional discrimination, he was not foreclosed from attempting to prove his claim via the failure to accommodate route:

> As is obvious, the plaintiff has no evidence, and has not even suggested, that the formulation or implementation of the MHSAA's eight-semester rule has in any way been motivated by considerations of barring students with learning disabilities from play. As we explained in *Sandison* with regard to the 19–year age limit at issue there, the regulation
>
> > is a "neutral rule"—neutral, that is, with respect to disability—and as far as the record shows, is neutrally applied by the MHSAA. Throughout the plaintiffs' first three years of high school, [the age limit] did not bar the students from playing interscholastic sports, yet the students were of course learning disabled during those years. It was not until they turned nineteen that [the age limit] operated to disqualify them. Accordingly, we must conclude that the age regulation does not exclude students from participating "solely by reason of" their disability.
>
> *Sandison,* 64 F.3d at 1032. As we concluded, "[t]he plaintiffs' respective learning disability does not prevent the two students from meeting the age requirement; the passage of time does." *Id.* at 1033. McPherson's claim depends, therefore, upon a showing that the MHSAA could have reasonably accommodated him and refused to do so.

*McPherson,* 119 F.3d at 460–61; *see also Washington,* 181 F.3d at 849 ("Viewing the [*McPherson* Court's] 'passage of time' holding in context, it is clear that the court was addressing only the first intentional discrimination method of proof, not the issue of causation. Otherwise, the court would not have gone on to discuss independently the alternative method of proof—

the failure to make reasonable modification.").

In light of *McPherson*, Defendant gains little traction by focusing on the fact that the OHSAA's Instate Residency Rule is neutral with respect to disability. The OHSAA argues that because Bylaw 4–6–3 applies to all disabled and nondisabled students without distinction, the rule does not exclude Charles from participating in interscholastic sports because of his disability but rather solely because he resides in Kentucky.[8] Like in *McPherson* and *Washington*, the Plaintiffs here do not allege that the Instate Residency Rule was motivated by any intent to bar disabled students from participating in OHSAA-governed activities, and the rule's neutrality coupled with the absence of any evidence of discriminatory intent forecloses any claim of intentional discrimination.

■ The rule's neutrality does not, as the *McPherson* Court recognized, prevent Plaintiffs from attempting to prove their Title II claim by showing that the OHSAA could have reasonably accommodated Charles and failed to do so. In failure to accommodate cases, the second two prongs of the general test for Title II claims—whether the plaintiff is "otherwise qualified" and whether he was excluded from certain activities "solely because of his disability"—represent "two sides of a single

coin." *See Washington*, 181 F.3d at 847; *Alexander v. Choate*, 469 U.S. 287, 300 n. 19, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985). The "ultimate question is the extent to which a [defendant] is required to make reasonable modifications in its programs for the needs of the [disabled]." *Washington*, 181 F.3d at 847 (quoting *Choate*, 469 U.S. at 300 n. 19, 105 S.Ct. 712). To answer that question, "an individualized inquiry must be made." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 688, 121 S.Ct. 1879, 149 L.Ed.2d 904 (2001) (addressing a failure to accommodate claim under Title III of the ADA, 42 U.S.C. § 12182, which requires private entities who own, lease, or operate places of public accommodation to provide certain reasonable modifications for disabled individuals); *see also Cruz ex rel. Cruz v. Pennsylvania Interscholastic Athletic Ass'n, Inc.*, 157 F.Supp.2d 485, 499 (E.D.Pa.2001) (holding that Title II claims require the same individualized inquiry).

As in *McPherson* and *Washington*, the only accommodation that would allow Charles to participate in interscholastic sports at his current high school would be a waiver of the OHSAA eligibility criteria at issue. Accordingly, the Court must determine whether requiring the OHSAA to grant a limited waiver of its Instate Residency Rule would "impose undue financial

---

8. To the extent Defendant raises this argument to attack causation, the Court finds sufficient evidence at this stage to show that but for Charles' disability, he would have attended school near his home, like his sister, and his residency would not bar him from participating in interscholastic sports. The evidence demonstrates that the Steines chose to send Charles to school in Ohio solely because of his learning disability, and Charles' current ineligibility in OHSAA-governed sports is a result of that decision. This case is analogous to *Washington*, 181 F.3d at 849, wherein the court rejected the defendant athletic association's argument that it was the passage of time rather than the plaintiff student's disabil-

ity that caused him to be ineligible to play for his high school basketball team under an eight-semester eligibility rule. Instead, the court found that but for the plaintiff's learning disability, he would not have temporarily dropped out of school, and would not be prevented from participating in sports during his senior year. In other words, while the defendant blamed the mere "passage of time" for the plaintiff's ineligibility, that passage of time would not have occurred but for the plaintiff's learning disability. *Id.* Similarly, in the instant case, Charles' out-of-state residency status would not have arisen but for his disability.

and administrative burdens, or require a fundamental alteration in the nature of the program." *McPherson,* 119 F.3d at 461 (internal quotation marks omitted) (quoting *Sandison,* 64 F.3d at 1034).

In this case, the Court finds that granting the requested waiver would impose at the very most only a minimal financial or· administrative burden. Defendant argues that if the OHSAA were to grant the Steines' request, many similar requests would follow. However, the OHSAA Commissioner, Dr. Ross, testified during his deposition that he was not aware of any financial burden that would result from allowing Charles to participate in interscholastic sports. (*See* Ross Dep. 36, Doc. 11 at PageID 143.) During the preliminary injunction hearing, Assistant Commissioner Price testified that the current exceptions to the Instate Residency Rule have not lead to an influx of out-of-state students seeking to participate in OHSAA-regulated sports. The OHSAA has not received any other requests for accommodation similar to that of the Steines. Price testified that she did not know how many students might be similarly situated to Charles or how many out-of-state students currently participate in interscholastic sports under one of the current residency exceptions. Her lack of knowledge on those issues severely undermined any opinion she offered about the burden that the requested waiver might impose. In fact, at least as of this stage in the suit, Defendant's assertion of burden appears to be based almost entirely on unfounded speculation.

 The only remaining question is whether granting the requested waiver would require a fundamental alteration in the nature of the OHSAA's program. As to this question, the burden of proof falls on the OHSAA. *Jones v. City of Monroe, MI,* 341 F.3d 474, 480 (6th Cir.2003) ("The public entity bears the burden of proving

that the accommodation would fundamentally alter the program."). "In cases involving waiver of applicable rules and regulations, the overall focus should be on 'whether waiver of the rule in the particular case would be so at odds with the purposes behind the rule that it would be a fundamental and unreasonable change.'" *Id.* (quoting *Dadian v. Village of Wilmette,* 269 F.3d 831, 838–39 (7th Cir.2001) and *Washington,* 181 F.3d at 850).

Defendant argues that its requirement that Ohio's interscholastic athletic programs and teams be composed of students who reside in Ohio is "essential," or "necessary." (Doc. 3 at PageID 58, 60.) Citing language generally favorable to its position, Defendant relies heavily on the Sixth Circuit's opinions in *Sandison,* 64 F.3d at 1034–35, and *McPherson,* in which student age limits and semester limitations, respectively, were found to be essential eligibility requirements. Both cases turned in large part on an analysis of the purpose behind the eligibility rule in question and the extent to which the requested waiver would conflict with that purpose. In *Sandison,* the court found that the impetus behind the age limit for student athletes was the need to safeguard other players against injury and to prevent any unfair competitive advantage that older and larger participants might provide. 64 F.3d at 1034–35 ("Removing the age restriction injects into competition students older than the vast majority of other students, and the record shows that the older students are generally more physically mature than younger students. Expanding the sports program to include older students works a fundamental alteration."). In *McPherson,* the purposes behind the eight-semester limitation included creating a sense of fair competition by limiting the level of athletic experience and skill, protecting the safety of all participants by limiting the size and physical maturity of

high school athletes, and preventing the "red-shirting of players," a practice "in which a player is deliberately held back for a year in order to allow the student to gain greater physical and athletic maturity, leading in turn, presumably, to greater athletic ability." 119 F.3d at 456, 461–62. In finding the rule to be necessary, the court emphasized that the defendant athletic association had "produced evidence that the absence of an eight-semester rule could lead to widespread red-shirting abuses, and that the rule was essential to preserving the philosophy that students attend school primarily for the classroom education and only secondarily to participate in interscholastic athletics." *Id.* at 462 (internal quotation marks omitted).

By contrast, in the instant case, conspicuously absent from Defendant's responsive pleading is any direct explanation of *why* the Instate Residency Rule is essential or necessary. As the *McPherson* Count noted,

> It would make no sense to conclude that the MHSAA's designation of a particular

rule as non-waivable requires a determination by this court that the rule is "necessary." To do so would amount to an improper delegation to the MHSAA of this court's responsibility to independently determine whether the rule is, in fact, necessary. In other words, the simple fact that the MHSAA labels a rule necessary does not make it so.

119 F.3d at 461. Unlike in *McPherson*, there is no evidence that the OHSAA adopted the Instate Residency Rule to promote student safety or to prevent red-shirting. The OHSAA Bylaws do not directly explain the purpose of the rule.[9] Price testified that she believed the purpose "is to extend the privilege of interscholastic participation to those students whose parents reside in the State of Ohio," and to prevent unfair recruiting, particularly by private schools, of students who might be exceptionally skilled in certain sports. (Price Dep. 42–43, Doc. 12 at PageID 160.) That purpose is consistent with the OHSAA's mission to "regulate and administer interscholastic athletic

9. The following explanation of purpose appears at the beginning of Bylaw 4 and applies generally to all of the rules for eligibility, including but not limited to student age, enrollment and attendance, scholarship, discipline, and residency:

> The eligibility rules in this Bylaw 4 are an integral part of the member schools of the OHSAA and the Commissioner's Office in order to create, administer and maintain the valuable and unique form of competition interscholastic athletics has to offer. This unique form of competition is a carefully constructed system that promotes competitive balance and serves the mission and purpose of education-based sports and activities. Interscholastic sports and activities are intended to foster a sense of community as well as to teach teamwork, citizenship and discipline. Other sporting organizations (and other forms of competition) exist to promote free player movement and arc primarily designed to promote athletic development

of the individual and provide a showcase for the athletic talents of those individuals. These organizations do not share the primary purposes of the member schools of this Association or the Commissioner's Office and therefore cannot provide the unique type of competition created and maintained by the OHSAA through its member schools. Efforts randomly to impose adjustments or favoritism on these eligibility rules damage and undermine the very purposes for sponsorship of interscholastic competitions, the member schools and their Association and, in turn, damage all the students who either participate in an Association sport/activity or who support them. The member schools of the OHSAA and the Commissioner's Office established by these member schools and charged with the ultimate authority to enforce these eligibility rules are committed to maintain this unique form of competition.

(Doc. 2–1 at PageID 30–31.)

competition in a fair and equitable manner while promoting the values of participation in interscholastic athletics as an integral part of the student's educational experience." (Prelim. Inj. Hr'g Ex. C at 1.)

While the Court appreciates that concern, the Court nevertheless questions the asserted necessity of the Instate Residency Rule to the functioning of a successful athletics program. First, as noted above, there is no evidence that significant numbers of out-of-state students are clamoring for entry into the OHSAA's programs or that such participation would even be feasible for large numbers of students.[10] Second, there similarly is no evidence the unfair recruitment of out-of-state students is a widespread concern. Finally, the broad nature and sheer number of residency exceptions that have been adopted suggest to this Court that the OHSAA itself does not actually view instate residency to be an essential eligibility criterion.[11] In fact, Bylaw 4–6–3 has *more exceptions that any other eligibility criterion* set forth in Section 6 of the Bylaws.

Even if the Court were to agree that the Instate Residency Rule is necessary, the Court nonetheless finds based on the individualized inquiry that the ADA requires that granting the narrow waiver requested by the Steines in this case would not fundamentally alter the nature of OHSAA athletics. The Court cannot accept Defendant's argument that *any* waiver of a "necessary" requirement would be tantamount to a fundamental alteration, particularly

when viewed in the context of this case where the rule in question already allows for complete waivers in no fewer than ten different scenarios. There is little if any material difference between the waiver the Steines request and the exceptions that currently exist. Defendant points out that several of the current exceptions to Bylaw 4–6–3 require some level of demonstrated continuous enrollment in Ohio schools, with certain exceptions requiring continuous enrollment within the same public school district or parochial school system. Granting an exception to Charles would be consistent with the spirit of those exceptions and of the general rule. He has attended school in Ohio since the first grade. The only reason why he has not continuously attended school in the same district or system within Ohio is because Springer is a stand-alone school and does not belong to any public school district or parochial school system. There are no allegations of unfair recruitment in this particular case. To the contrary, all of the evidence points to the fact that the Steines chose Summit because of its academic offerings and disability support services. As the *Washington* Court noted, "[t]o require a focus on the general purposes behind a rule without considering the effect an exception for a disabled individual would have on those purposes would negate the reason for requiring reasonable exceptions." 181 F.3d at 851. In this case, the requested waiver would not detract from

10. There has been no evidence as to the number of out-of-state students who attend school in Ohio, nor as to the relative ease or difficulty of enrolling as an out-of-state student at public or private schools in Ohio.

11. The Sixth Circuit has cautioned against treating the existence of exceptions to a rule as dispositive proof that the rule is not necessary. *See McPherson,* 119 F.3d at 461 (noting that an athletic association's "determination

that a rule may sometimes be waived under some circumstances does not mean that the rule, as a general matter, is not "necessary" to the successful functioning of a sports program"). However, the Sixth Circuit did not indicate that a court should never consider the extent of a rule's exceptions when evaluating the alleged necessity of a rule. In other words, though they may not serve as conclusive evidence, prior exceptions are probative.

or undermine the purpose of the Instate Residency Rule.

Defendant attempts to paint Plaintiffs' request for accommodation as requiring a broad waiver of the Instate Residency Rule for all disabled out-of-state students. However, the Court is not convinced that an order requiring a waiver for Charles would force the OHSAA to adopt a broad exception for all disabled nonresident students who seek to play interscholastic sports while attending school in Ohio. In reality, Plaintiffs request a much more limited waiver, one that would simply permit Charles, a child who has attended school in Ohio since the first grade, to play soccer at Summit. It would remain within the OHSAA's discretion to determine how best to craft the waiver and how broad the waiver's reach should extend. The Court can conceive of narrower exceptions that would more closely track current exceptions to the Instate Residency Rule while preserving the spirit and purpose of the rule. For example, the OHSAA could craft an exception that would permit all students with ADA qualifying disabilities who have attended school in Ohio for a specified continuous period of time [12] and who, during that time, attended a school such as Springer, which offers education exclusively to children with disabilities.[13] Such an exception would be based on easily verifiable, objective criteria, would apply to only a narrow pool of potential students, and would not result in a substantial administrative burden. This case therefore significantly differs from *Sandison* and from *McPherson*, in which cases the Sixth Circuit was concerned that an exception allowing for case-by-case waivers of age and semester limits would force the athletic association to make "near-impossible determinations about a particular student's physical and athletic maturity." *McPherson*, 119 F.3d at 462–63 (internal quotation marks omitted) (discussing the analyses that would be required by the waivers requested in *Sandison* and in *McPherson*, and noting that "It is unclear how the MHSAA could ever be expected to sort out the legitimate requests from those based on a desire to gain an unfair advantage. In short, requiring the MHSAA to grant waivers under these circumstances would be to require it to take on an immense administrative burden"); *see also Washington*, 181 F.3d at 852 (finding a limited waiver of an athletic association's semester limitation to be a reasonable accommodation, and noting that "[t]he few case-by-case analyses that the [association] would need to conduct hardly can be described as an excessive burden").

Having found that the Plaintiffs are likely to succeed on the merits of their claim under Title II of the ADA, the Court turns now to the remainder of the factors the Court must consider before granting injunctive relief.

**B. Irreparable Injury to Plaintiffs**

■ Plaintiffs claim that Charles Steines' learning disability negatively impacts his social skills and self-image. Through his participation in sports, his social skills, self-image, behavior, and academic performance have improved. Both Price and Dr. Ross conceded that the OHSAA views "participation in interscholastic athletics as an integral part of a student's

---

12. For example, since first grade or since fourth grade.

13. By suggesting such an exception, the Court does not indicate that it is the only or the most appropriate exception. Indeed, there may be future situations in which an even broader exception is proven to be necessary to ensure compliance with the ADA. The Court suggests the above exception only to demonstrate that the effect of the Court's injunction is not nearly as broad as Defendant suggests.

educational experience." (Ross Dep. 9, Doc. 11 at PageID 137; Price Dep. 33, Doc. 12 at PageID 158.) They also agreed that interscholastic athletic programs are "an extension of the classroom" that "exist to prepare students for the next level of life," and that participation in those programs "is intended to foster a sense of community, as well as to teach teamwork, citizenship, and discipline." (Ross Dep. 9, Doc. 11 at PageID 137; Price Dep. 33–34, Doc. 12 at PageID 158.) Based on the heightened importance that participation in interscholastic sports has had on Charles' ability to overcome his disability, the Court finds that refusing to allow him to continue to participate in those programs at his current school would cause him irreparable injury.

## C. Substantial Harm to Others

The requested injunctive relief poses no threat of substantial harm to others. Defendant's allegations that an injunction would harm other OHSAA member schools by promoting unfair competition are completely unfounded. Defendant argues that allowing Charles to participate would perpetuate a preexisting belief among many that "non-public schools have an unfair advantage over the public schools for a variety of reasons." (Doc. 3 at PageID 66.) Even if that fear proves true, the Court cannot let public misconceptions outweigh the need for fair treatment of a disabled child.

## D. Public Interest

The Court, finally, finds that the public interest is served by permitting a disabled child who has attended school in Ohio since the first grade and who is not alleged to have been unfairly recruited by his current school to participate in interscholastic sports.

## IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Plaintiffs' Motion for a Preliminary Injunction and hereby preliminarily enjoins Defendant OHSAA from enforcing or threatening or seeking to enforce OHSAA BYLAW 4–6–3 against Plaintiffs. To the extent that this Order will require the OHSAA to adopt an additional exception to Bylaw 4–6–3, the Court defers to Defendant to determine the specific scope of that exception. However, Defendant may in no way exclude Charles from participation in OHSAA-regulated athletic programs on the basis of the Instate Residency Rule.

**IT IS SO ORDERED.**

